EUGENE P. MATHIAS AND BARBARA J. MATHIAS, PETITIONERS *v.* COMMISSIONERS OF INTERNAL REVENUE, RESPONDENT

Docket No. 406–66. Filed September 30, 1968.

*Charles A. Pinney, Jr.*, for the petitioner.
*Stephen W. Simpson*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' income tax in the amount of $4,231.95 and $8,763.62 for the taxable years 1962 and 1963, respectively. The sole issue involved is the valuation of two paintings for purposes of otherwise concededly deductible charitable contributions under section 170.[1]

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Petitioners, Eugene P. and Barbara J. Mathias, were husband and wife and resided in Los Angeles County, Calif., during the taxable years 1962 and 1963 and at the time of the filing of the petition herein. Petitioner Barbara J. Mathias is a party hereto only by virtue of having filed joint returns with her husband. Any reference herein to petitioner shall be deemed to refer to Eugene P. Mathias.

In November 1962, petitioner acquired title to two oil paintings. One painting by Ferdinand Keller, entitled "Grotto of Love," was acquired

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

by petitioner in satisfaction of a debt due and owing to petitioner from one William J. Thornton in the amount of $5,500. The other is a half-length portrait painting, ascribed to Gilbert Stuart and entitled, "Sir John Jervis, Earl of St. Vincent." It was acquired by petitioner in satisfaction of a debt from one David Dial due to petitioner in the amount of $9,000.

Thereafter, in December 1962, petitioner donated the painting entitled "Grotto of Love" to Loyola University of Los Angeles and took a deduction for a charitable contribution therefor on his 1962 tax return in the amount of $12,750. Attached to petitioner's return was an appraisal by one Eldred L. Meyer, purporting to value said painting, as of December 26, 1962, at $13,500, and an appraisal by one Taylor Curtis, which was dated September 27, 1962, and purported to value said painting at $12,000.

On or about July 31, 1963, petitioner donated an 80-percent undivided interest in the painting entitled "Sir John Jervis, Earl of St. Vincent" to the University of Southern California, Los Angeles, Calif., and took a deduction for a charitable contribution therefor on his 1963 tax return based on a valuation of the painting of $25,000. Attached to petitioner's return was an appraisal by one Eldred L. Meyer purporting to value said painting, as of May 14, 1963, at $25,000. Petitioner had previously obtained two other appraisals: One by Ostrander Appraisal Service, dated January 14, 1963, and purporting to value said painting at "not less than $15,000," and one by Milton Holland, dated December 26, 1962, and giving the amount of $12,500 as the "Estimate of Market Value." Both the Ostrander and Holland appraisals listed the following provenance for the painting: "Ex Collection of Guy Baron, London; Ex Collection of Lady Astor, circa 1910; Ex Collection of David Dial, West Los Angeles."

The painting entitled "Sir John Jervis, Earl of St. Vincent" had also been appraised at $25,000 for insurance purposes in July 1962 by one C. L. J. Damme.

Gilbert Stuart is a well-known American painter, who was born in 1755 and died in 1828. His life is divided into three periods: First Period—Life in Rhode Island, 1755–75; Second Period—Life in England and Ireland, 1775–93; Third Period—Life in America, 1793–1828. Stuart's paintings were frequently copied by others and Stuart on occasion made copies of his own paintings.

One of the leading authorities on Gilbert Stuart is Lawrence Park. Park, in his work, "Gilbert Stuart, An Illustrated Descriptive List of his Works," published in 1926, describes John Jervis, Earl of St. Vincent, as an officer in the English Navy and lists a full-length painting of Rear Admiral John Jervis, Earl of St. Vincent, done by Gilbert Stuart, circa 1785. Park also lists another painting by Gilbert Stuart as being of the Earl of St. Vincent (with a question mark after this

designation), the reproduction of which is similar to the painting involved herein. Park gives no time at which such painting was done and his description includes the following:

### EARL OF ST. VINCENT (?)

#### *1734/5–1823*

Canvas, 28×25 inches. Painted as an oval with light spandrels. This portrait shows a fleshy-faced man, turned three-quarters to the left, with a ruddy complexion. His hair is powdered and worn in a queue, the bow of which is seen, His uniform is a dark blue coat with large gold buttons, and trimmed around the collar and down the front with gold braid; the waistcoat is of a creamy white color, with small gold buttons; white neckcloth and *jabot*, the ends of the latter showing above his waistcoat. His eyebrows are black and rather heavy. The background in the upper part of the picture is dark, lighting up towards the center of the picture to a cold blue, and beyond his right shoulder appears a dark sunset sky. It is a very attractive and well executed portrait.

Although called a portrait of the Earl of St. Vincent, it bears not the slightest resemblance to other portraits of this man.

It was owned by Doctor Gilbert Parker of Philadelphia, who, some years ago, sold it to the late Charles Henry Hart of Philadelphia, from whom it was purchased about 1908 by the Honorable Thomas Jefferson Coolidge (1863–1920) of Boston. It is now owned by his widow.

The identity of the subject of a portrait painting is an element in determining its value.

The differences between the painting involved herein and the one reproduced in Park are as follows:

(1) The Park reproduction shows five brass buttons on the uniform coat and waistcoat, whereas the painting involved herein shows six buttons.

(2) The texture and position of the jabot (ruffle) at the throat is different in the painting involved herein from that shown in the Park reproduction.

(3) There is a greater amount of the waistcoat showing above the collar of the uniform coat in the Park reproduction than on the painting involved herein.

(4) The black ribbon bow on the back of the hair is shown differently in the Park reproduction than in the painting involved herein.

(5) The Park description of the background "lighting up towards the center of the picture to a cold blue" contrasts with the painting involved herein, where the background is quite dark and no blue is shown.

The amount of restoration of the painting entitled "Sir John Jervis, Earl of St. Vincent" was not substantial.

According to "World Collectors Annuary" and "Art Price Annual," during calendar years 1962 and 1963, portrait paintings at-

tributed to Gilbert Stuart and of a size comparable to the painting involved herein, were sold at auction as follows:

| Date | Painting | Price |
|---|---|---|
| Apr. 14, 1962 | Robert Shaw | $1,300 |
| Apr. 14, 1962 | John Logan | 1,100 |
| Apr. 17, 1962 | John Lord Fitzgibbon | 1,000 |
| June 15, 1962 | Mrs. Samuel Dick | 15,188 |
| Jan. 5, 1963 | John Shaw | 19,500 |
| Mar. 29, 1963 | George Washington | 9,928 |
| Nov. 22, 1963 | Thomas Smith, Master of Stationer's Company | 2,372 |

Other sales during approximately the same period included:

| | | |
|---|---|---|
| Sale No. 257 | Sir Charles Warre Mallet | $10,080 |
| Sale No. 733 | Ozias Humphrey | 9,000 |

Respondent determined the values of the paintings involved herein as follows: "Grotto of Love," $500; "Sir John Jervis, Earl of St. Vincent," $1,200.

### ULTIMATE FINDINGS OF FACT

The painting by Ferdinand Keller, entitled "Grotto of Love," had a value of $500 on the date of transfer by petitioner.

The painting, ascribed to Gilbert Stuart, entitled "Sir John Jervis, Earl of St. Vincent," had a value of $8,000 on the date of transfer by petitioner.

### OPINION

The sole question before us is a purely factual one—namely, the proper value of two paintings which were the subject of charitable contributions by petitioner in the taxable years before us. Respondent does not question the exempt character of the recipients or otherwise dispute the right of petitioner to deductions under section 170. In an effort to assist the Court in the performance of its task, both parties produced various witnesses, who were considered by them to be experts. We see no need to subject the qualifications of these witnesses to detailed analysis. It is sufficient to note that we have taken their varying degrees of expertise into account in making our ultimate factual determinations.

We deal first with the oil painting by Ferdinand Keller entitled "Grotto of Love." Petitioner's valuation of $12,750 contained in his 1962 return was obviously an average of the figures which appeared in two appraisal reports which he had obtained prior to the time of filing. Petitioner offered no testimony as to value at the trial and obviously the two appraisal reports are not in and of themselves probative evidence. Respondent, in his deficiency notice, valued the painting at $500 and introduced a witness at the trial who testified in support of that determination. While we agree with petitioner that such testimony had overtones of doubt, it does not follow that petitioner should prevail. In the absence of evidence to sustain petitioner's position, the

presumption of correctness attaching to respondent's determination stands undiluted.

With respect to the second painting, purportedly by Gilbert Stuart and entitled "Sir John Jervis, Earl of St. Vincent," petitioner claims a value of $25,000 and respondent asserts that the proper amount is $1,200. The problem of valuation revolves around three elements: (1) The authenticity of the painting, i.e., whether it was done by Gilbert Stuart, (2) the identity of the subject, i.e., whether it was a portrait of Sir John Jervis, and (3) the quantum of restoration.[2] The painting was on view throughout the trial and, insofar as the last element is concerned, the Court succumbed to the blandishments of the parties to become an expert in its own right. It examined the painting closely under a "black light" and determined, as the findings of fact show, that the amount of restoration was not substantial. The prospect of extending our role as an art expert to the other two elements was an intriguing one but, after careful consideration, we decline to do so. Indeed, we think that there is good reason for our not venturing into such a difficult area, particularly where, as is the case herein, the evidence is conflicting. It is clear to us that the identity of the subject of the painting and of the artist has a marked effect on value. But, in the final analysis, we think that what blemishes may exist in these respects are simply depressants to be taken into account in determining value—the downward effect varying directly with the degree of the blemishes and the extent to which they were either known or reasonably should have been known on the critical date. In this respect, this case is not wholly unlike those where it is necessary to value a patent or a claim whose validity is in doubt. Cf. *Harry C. Porter*, 49 T.C. 207 (1967); see *Estate of Arthur H. Hull*, 38 T.C. 512, 524 (1962), reversed on another issue 325 F. 2d 367 (C.A. 3, 1963); *Syracuse Food Products Corporation*, 21 B.T.A. 865, 885 (1930); see *B. F. Sturtevant Co.* v. *United States*, 18 F. Supp. 28, 34 (D. Mass. 1937).

As we see it, there were several blemishes with respect to the painting involved herein entitled "Sir John Jervis, Earl of St. Vincent." First, doubt as to the identity of the subject had clearly been signaled by Park. Other reproductions of portraits purporting to be of Sir John Jervis, produced at the trial, reinforced this doubt. Second, there are substantial differences between the painting involved herein and the reproduction in Park—relating to the number of brass buttons, the style and location of the jabot (ruffle), the degree of exposure of the waistcoat above the uniform collar, the image of the ribbon at the back of the hair, and the background colors. Third, the

---

[2] Respondent raised no question as to discounting the value to reflect the fact that petitioner gave only an undivided interest in the painting in 1963. Cf. *Estate of Nina M. Campanari*, 5 T.C. 488 (1945).

obvious difference between Park's provenance (record of prior ownership) and that specified by petitioner's appraisers raises further complications. Of course, if there were in fact two half-length portraits of Sir John Jervis by Gilbert Stuart, there would necessarily be two different provenances. On the other hand, the different provenances, under the circumstances, can also point in the direction of doubt as to authenticity of the painting involved herein.

Concededly, Park is not the uncontradictable seer and we do not mean to imply that he is. But Park is sufficiently authoritative [3] that we think that the differences thus indicated should have received more attention and consideration from petitioner's appraisers,[4] who, on the whole, seemed to us to have accorded them cavalier disinterest, if not disdain. The fact that Gilbert Stuart was often copied increases the degree of doubt as to subject matter and authenticity. In short, the blemishes involved herein were potentially substantial and were known or reasonably should have been known to petitioner and his appraisers at the critical date. They were substantial depressants of the value of the painting.

Moreover, we note that the value which petitioner would have us place on the painting is substantially in excess of the prices at which paintings purportedly from the hand of Gilbert Stuart were sold during the period just prior and subsequent to the date of the gift. It would appear from the subject matter of three of the four more highly priced paintings that they may well have been executed during the later American period of Stuart's life, whereas the painting involved herein, if it was a Stuart, was done during his English period. The evidence indicates that paintings by Stuart during his American period are usually more valuable than those done during the English period. We recognize, of course, that we were furnished with no evidence as to the physical condition of these other paintings, the importance of the subject, the extent to which their authenticity may have been open to question, the circumstances surrounding the sales, or other factors that may have influenced the particular sales prices. All of the foregoing factors tend to undermine the weight to be given to such prices but we do not think they should be entirely ignored. Petitioner also argues that auction prices are not good evidence of value. Whatever may be the validity of that proposition in other areas (cf. *Daniel S. McGuire*, 44 T.C. 801 (1965)), we think they have considerably more significance in the art field.

---

[3] It is also noteworthy that a half-length portrait of Sir John Jervis is not mentioned in another leading authority on Stuart. See Mount, "Gilbert Stuart, a Biography" 362 (1964).

[4] Only Milton Holland testified in person at the trial for petitioner. In addition, petitioner presented the deposition of Cornelius Leendert Damme (who had died prior to trial) as apparently had Eldred Meyer. No explanation was furnished as to why Taylor Curtis or a representative of Ostrander Appraisal Service did not testify. Respondent presented one expert, Paul Metcalf. Gene Record also testified for petitioner on the issues of authenticity (but not value) and the amount of restoration.

We are unable to conclude that petitioner has sustained his burden of proof to the full extent of the $25,000 value he claims.

Petitioner curiously seems to argue that, with respect to "Grotto of Love," the fact that he took the painting in satisfaction of a $5,500 debt makes that figure strong evidence of value but that, with respect to "Sir John Jervis, Earl of St. Vincent," a similar acquisition for $9,000 should be ignored. Aside from the apparent inconsistency of petitioner's position, we think that, under the circumstances, these amounts have, at best, a marginal bearing on value. To be sure, we have no reason to doubt that the acquisitions were other than at arm's length. In this context, the amount of the debt discharged might well be considered as indicating the range of *maximum* value, since it would be unlikely for an arm's-length debtor to discharge his debt with property having a value substantially in excess of his debt. But, the question before us is not maximum value but actual value. For aught that appears on the record herein, petitioner may simply have been salvaging all that he could get from the debtors, with the result that the amount of the debt cannot be equated with value.

On the basis of the entire record, and keeping in mind that petitioner has the burden of proof, we have determined that "Grotto of Love" had a value of $500 and that "Sir John Jervis, Earl of St. Vincent" had a value of $8,000 at the time of transfer by petitioner.

*Decision will be entered under Rule 50.*