SID FARBER and NADIA FARBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Farber v. Commissioner
Docket No. 2542-70.
United States Tax Court
T.C. Memo 1974-155; 1974 Tax Ct. Memo LEXIS 164; 33 T.C.M. (CCH) 673; T.C.M. (RIA) 74155; June 17, 1974, Filed. Richard A. Osserman and Stephen F. Huff, for the petitioners. Powell W. Holly, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION
TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax in the amounts of $37,307.94 and $35,415.23 for the taxable years 1966 and 1967, respectively. The sole issue presented for decision is the valuation of a painting which was the subject of a charitable contribution. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. The petitioners are husband and wife who resided in New York, New York, at the time they filed their petition herein. For the calendar years 1966 and 1967, petitioners filed joint individual Federal *165 income tax returns with the district director of internal revenue, Booklyn, New York. On December 29, 1966, petitioners donated a painting entitled "Susanna" to Hofstra College (now Hofstra University) of Hempstead, Long Island, New York. Hofstra College was, at the time of the gift, an educational organization and contributions to it were deductible up to 30 percent of petitioners' adjusted gross income and were subject to the carryover provision for charitable contributions. See section 170, Internal Revenue Code of 1954, as in effect for the taxable year 1966. Petitioners, valuing the painting at $150,000, deducted $79,264.60 in 1966 and carried forward $70,735.40 as a deduction in 1967. Respondent valued the painting at $2,000 and determined the deficiencies accordingly. "Susanna" is an oil on canvas, measuring 112 x 93 cm. (approximately 44 x 36.6 inches), which petitioners claim is an original work of Jacopo Robusti (known as Tintoretto). The painting portrays a nude female in a sitting position. She is wearing some jewelry and a drape lies across part of her body. In the background is a forest. The painting is on a canvas of the age in which *166 Tintoretto lived, i.e., the late Sixteenth Century. The painting is not signed but Tintoretto rarely signed his works. Over the years prior to the gift, the painting had been substantially damaged. Many parts have been restored, although some restoration is customarily present in old paintings. Petitioners apparently acquired the painting in the 1950's. Tintoretto is widely recognized as one of the great Italian masters of the Sixteenth Century. He was an extremely prolific artist who had a studio and is known to have painted with assistants. Under the direction of his son, Tintoretto's studio continued to function after his death. One of the most famous Tintoretto paintings is a fully authenticated work which now hangs in the Kunsthistorisches Museum in Vienna entitled "Susanna and the Elders." The Susanna in this painting is the same nude female in the identical position as that in the painting in question, but there are other people, animals, and a different background in the Vienna work. Tintoretto is known to have painted this same subject, in different positions, several times. In the donated work, the figure of Susanna appears to the untrained eye to be almost identical *167 to that in the Vienna work. In fact, one of petitioners' "experts" computed the size of the two figures and found them to be identical. [1]
At the outset, we think certain comments are in order. We have previously made clear that the settlement process is obviously more conducive to the proper disposition of disputes such as this because a valuation issue is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." See Morris M. Messing, 48 T.C. 502, 512 (1967). The fact *168 that the underlying dispute herein relates to the authenticity of a painting and its effect on value, rather than the establishment of value in the normal context, in no way lessens the need for resolution by way of settlement. Indeed, as we have also made clear, "there is good reason for our not entering into such a difficult area [authenticity], particularly where * * * the evidence is conflicting," which is the case herein. See Eugene P. Mathias, 50 T.C. 994, 998 (1968). What is more to the point is the fact that the parties herein have seemingly made a conscious effort to force us to assume a role which is certainly distasteful, if not unwise. The evidence consists almost entirely of testimony by various "experts" as to whether the painting is by the hand of Tintoretto and, in a general way, as to the purported fair market value at the date of the gift to Hofstra. Despite the fact that petitioners were invited by the Court to do so, no evidence was presented as to the circumstances under which the petitioners bought the painting, how much they paid for it, or the value at which it was insured in December 1966. Nor were we told how the painting was handled *169 by Hofstra, i.e., whether and how it was displayed, aside from a passing reference by one of petitioners' "expert" witnesses that, when he saw the painting for the first time in late 1973, "it was stored in the museum." Granted that such elements may have only a tangential impact on the determination of fair market value on a given date, they have a pertinency which we think should not have been cavalierly ignored. See Publicker v. Commissioner, 206 F.2d 250, 254 (C.A. 3, 1953); Daniel S. McGuire, 44 T.C. 801, 810 (1965). [2] Even the "expert" testimony as to fair market value was not supplemented by available evidence from catalogues, which are known to exist, containing the details of sales of paintings of well-known artists during a reasonable period in which the date of the gift to Hofstra occurs. Compare Eugene P. Mathias, supra, 50 T.C. at 996-997, where such supplementary evidence was submitted to the Court. We can only conclude that the primary guideline for presentation of the case by both parties was that the less, rather than the more, the Court knew, the better. *170 In their effort to carry their burden of proof, petitioners offered three witnesses, one of whom was deposed through written interrogatories and cross-interrogatories, and letters of endorsement from five Tintoretto experts. Four of these letters were executed in 1928 (one having been reaffirmed in 1970) and one in 1949. Respondent disputes their conclusions, but he has stipulated to the authenticity of these "expertises." Accordingly, they may properly be considered as part of the evidence, subject to our determination of the weight to be accorded them in light of their clearly hearsay status. J. Willard Harris, 46 T.C. 672, 674 (1966). Respondent called two witnesses. We decline to enter the battle over the relative qualifications of the "expert" witnesses, except to say that we have considered these as factors in our ultimate determination. Although, in certain respects, each witness' testimony was informative, we were left with an overall feeling of dissatisfaction and consequent frustration. For various reasons, revealed by the record, we were unable to put much confidence into any witness' study of the painting or his conclusions.[3] We note in this connection *171 that the "expert" witnesses gave the painting only the most cursory examination and that none of them had even heard of the painting until 1973, when they were brought into the case, or, as regards the deposed witness, when petitioners exhibited the painting in Italy in 1964. There is no provenance of the work and apparently no mention of it in any art literature or catalogues. Compare Eugene P. Mathias, supra.
Not only were the "expert" witnesses in conflict as to the authenticity of the painting but they were diametrically opposed *172 on its condition. Faced with this irreconcilable situation, we watched one of respondent's witnesses conduct a black light examination in the darkened courtroom. Based on this examination, we found as a fact that there had been a substantial amount of restoration to the painting. Cf. Eugene P. Mathias, supra, 50 T.C. at 998. Much of this was of poor quality. Although this amount of restoration may not be unusual for a painting this old, it is a factor to be considered in valuing the work. Finally, one very important factor in determining the value of any given painting is the sale prices of comparable works which were sold during the same time period as the date of the gift. See Estate of David Smith, 57 T.C. 650, 659 (1972), on appeal (C.A. 2, Apr. 25, 1974). Petitioners' "experts" submitted their own lists of auction sales and asked us to be guided thereby. Though respondent has not challenged the veracity of these lists, we refuse to base our valuation on the sale prices. The vast majority of listed sales are totally incomparable. They are by different artists (such as Rembrandt, Modigliani, Van Gogh, Manet, Monet, Picasso, Renoir, Toulouse-Lautrec, *173 and Velazquez), from different schools and periods, and many are widely recognized as true masterpieces (such as Rembrandt's "Aristotle Contemplating the Bust of Homer"). We would not begin to consider these paintings comparable. Also, on petitioners' "experts"" lists were two Tintorettos, one sold at auction on December 7, 1950 for $300,000, the other on May 24, 1963. Petitioners' first "expert" said the latter painting sold for $150,000, the second said it sold for $160,000. [4] Respondent's second "expert" testified that four "authentic" Tintorettos sold at auction between 1969 and 1972 for $13,000 to $23,000. We were furnished no evidence as to the physical condition of any of these six Tintoretto paintings, only their sizes. We do not know their relative importance, the extent to which their authenticity may have been open to question, the circumstances surrounding the sales, or other factors which may have influenced the particular sales prices. Thus, while auction prices are evidence of value in the art field ( Eugene P. Mathias, supra, 50 T.C. at 999; Estate of David Smith, supra, 57 T.C. AT 658, n. 6), we have not been given much to work with *174 on the record presented herein. We see no point in further dissecting the contradictory testimony which was submitted or in detailing all of the factors which we have taken into account. We move directly to a determination of the ultimate fact upon which disposition of this case depends, namely, the fair market value of "Susanna" on December 29, 1966. We discharge our responsibility based upon the entire record and our observatory evaluation of the witnesses. We emphasize that our determination is based exclusively upon what the particular record herein shows - and also does not show - and that such determination is solely for the purposes of this case without in any way implying what it would be on the basis of another record containing different facts and different testimony. Furthermore, we again refuse to decide the underlying question of authenticity; we believe there is sufficient conflict on this record to conclude *175 that a serious depressant on market value did exist on the critical date. See Eugene P. Mathias, supra, 50 T.C. at 998. We think that a willing buyer and a willing seller, acting solely on the basis of the information submitted to this Court in this case, would have arrived at a price not in excess of $10,000. Accordingly, we find as an ultimate fact that the fair market value of "Susanna" on December 29, 1966 was $10,000 and that petitioners' deduction should be limited to this amount. Decision will be entered under Rule 155. Footnotes
1. His method for reaching this conclusion is somewhat in doubt. The following excerpt is from cross-examination: Respondent's counsel: Now, how do you know that the two figures have the same dimensions? Expert: Because I know the dimension of the - of the Vienna painting, which is a published figure, and I physically measured parts of the body in this one, and computed on a mathematical basis the - Q. But you did not - A. Exact size of the figure in Vienna, and it corresponds to this one. Q. You did not actually measure the size of the figure in the Vienna painting? A.I did by computation. Q. But not actual measurement? A. No, I did not. ↩
2. Cf. Charles A. Weil, T.C. Memo. 1967-78↩. 3. The witness, who was subjected to interrogatories, was less than forthcoming with respect to an article he had written on the subject painting. He refused to answer at whose request he had written the article, he did not know if it had been published, and he refused to state whether he had been paid for writing it. He also stated that he had "never met Contessa Navarro," although that person was also identified to him in the interrogatory as "Mrs. Sid Farber." The foregoing is to be contrasted with the stipulation of the parties that the article was written at the request of the petitioners and that they paid the witness for it. ↩
4. Although the mere existence of this discrepancy has not influenced our decision herein, we are constrained to observe that the submission of supplementary catalogue evidence (see pp. 6-7, supra ) presumably would have established the known fact. ↩