JAMES A. WALKER & PAMELA A. WALKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walker v. Commissioner
Docket No. 5499-79.
United States Tax Court
T.C. Memo 1982-495; 1982 Tax Ct. Memo LEXIS 247; 44 T.C.M. (CCH) 970; T.C.M. (RIA) 82495; August 30, 1982. Gene M. Winburn, for the petitioners. David D. Aughtry, for the respondent. *248 TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1973
$2,141.00
1974
10,700.50
1975
16,530.00
Of these amounts, $341.50 for 1974 and $274.00 for 1975 have been asserted in respondent's amended answer to petition. [1] The sole issue for our determination is the value of land contributed to Shorter College in 1974 and 1975. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, James A. Walker and Pamela A. Walker, resided in Stone Mountain, Ga., at the time they filed their petition herein. [3]
In December 1972, *249 Palm Shores Development Corporation (Palm Shores) purchased Porter Island for $461,000. Porter Island is a 521-acre tract of land located in Wakulla County, Fla., and fronting on Dickerson Bay. Access is provided by Florida Highway 372A, a two-lane, asphalt road which bisects the property. Porter Island can be divided into three distinct topographical sections: (1) approximately 121 acres of mixed marsh and highland north of Cut Off Creek; (2) approximately 40 acres of previously filled raised dryland at the southern tip of the island (the spoil bank area); (3) the marshland lying between the first two sections (the marshland). On December 29, 1972, Palm Shores brought an action to quiet title to a portion of the 521 acres which was located north of Cut Off Creek. On July 11, 1973, the Fiddler's Point Tenancy-in-Common (the cotenancy) was formed. [4] On the day of its formation, the cotenancy purchased Porter Island from Palm Shores for $467,000. The property purchased by the cotenancy did not include an undivided two-thirds interest in the mineral rights which had been sold by previous owners of the land. Record title to the island was placed in trust for the cotenancy with *250 Fred D. Boyd (Dr. Boyd) as trustee, and Dr. Boyd was substituted as plaintiff in the action to quiet title which had been brought by Palm Shores. Petitioner purchased a 1/35th interest in the cotenancy for $20,000 on July 12, 1973. On December 21, 1974, the cotenancy transferred a parcel of land (the 1974 tract) to Shorter College (the College) of Rome, Ga. The College is an organization described in section 501(c)(3). [5] This parcel is described in the indenture which evidences the conveyance as containing 24 acres. It is located between Cut Off Creek and the spoil bank area, i.e., marshland, on the eastern side of Route 372A. The 1974 tract fronts Dickerson Bay. Judgment in the action to quiet title was entered for Dr. Boyd, as trustee, on February 7, 1975. On December 26, 1975, the contenancy contributed *251 another parcel of land (the 1975 tract), also described as containing 24 acres, to the College. This land, also marshland, is located on the western side of Route 372A, and its northern and northeastern boundary fronts Cut Off Creek. The cotenancy has continued to make annual contributions of parcels of the marshland to the College. Shorter College utilizes all the donated land for an outdoor classroom. Three types of vegetation grow on the 1974 and 1975 tracts: spartina alterniflora (spartina), juncus roemarianus (juncus), and salicornia natural hammock (salicornia). No part of Porter Island has been developed to date. In order to develop the land, permits are required from Federal, state, and local regulatory agencies. At one time, the cotenancy had planned to build 432 condominium units on the 40-acre spoil bank area. On September 13, 1974, Cleveland S. Boutwell, Jr., representing the cotenancy, met with representatives from various Florida State agencies dealing with developmental and environmental concerns. Mr. Boutwell was advised by several representatives of the regulatory agencies that the questions of the location of the high-water mark and the ownership of the *252 land would have to be resolved. On July 14, 1975, the Wakulla County Board of Commissioners gave approval to the preliminary plans for a revised development which was to consist of 248 condominium units. Also in 1975, Mr. Boutwell applied to various state agencies and the U.S. Army Corps of Engineers (Corps of Engineers) for permits relative to the condominium development. Those permits were neither granted nor denied. In September 1976, pursuant to Mr. Boutwell's request, the application to the Corps of Engineers was cancelled. Neither the cotenancy nor Shorter College has applied for the various Federal, state, and local permits necessary for development of the marshland. The likelihood of obtaining Federal and state permits to develop the marshland is extremely doubtful. That portion of marshland which is covered by juncus and spartina is defined as Class II waters. It is the policy of state agencies to deny applications for dredging, filling, or driving piles within Class II waters. [6] That the Corps of Engineers would grant an application for a permit to fill the marshland is likewise extremely doubtful. Even if a Corps of Engineers permit were initially granted, it *253 would be null and void if other required Federal, state, and local permits were not obtained. Several of the original participants have sold their interests in the cotenancy. These sales include: Proportionate cotenancy
interest
Sales
in 450 acres *
Date of sale
price
1/35
June 27, 1977
$18,000
1/35
June 27, 1977
18,000
1/35
August 10, 1977
20,000
1/70
December 30, 1977
9,000
1/70
December 30, 1977
9,000
On his 1974 and 1975 returns, petitioner calculated his deduction for the charitable contribution *254 of the land as follows: 1/35 interest in the cotenancy X 24 acres contributed X $45,000 per acre. Respondent, in his notice of deficiency, determined that the land's fair market value was $24,000 for 1974 (calculated as 24 acres X $1,000 per acre) and $19,200 for 1975 (calculated as 24 acres X $800 per acre). In his amended answer, respondent asserted that the fair market value of the land was $400 per acre and that petitioner was entitled to no charitable deduction in 1974 or 1975 because the transfers to Shorter College took place "in anticipation of benefits [to members of the cotenancy] which exceed the benefit to Shorter College or to the public in general." On brief, respondent abandoned his position that petitioner was entitled to no charitable deduction for the years in issue. OPINION Section 170 allows an individual a deduction for charitable contributions subject to certain percentage limitations and with a carryover of any excess contribution. See section 170(b) and (d). If a charitable contribution is made in property other than money, the amount of the contribution is *255 the fair market value of the property at the time of the contribution. Section 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having a reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. The parties are at odds over two aspects of petitioner's charitable contribution: (1) the number of acres of land which were owned by the cotenancy and effectively conveyed to Shorter College, which depends upon the location of the mean high water mark; (2) the fair market value of the acreage contributed. At the outset, we think certain comments are in order. We have previously made clear that the settlement process is more conducive to the proper disposition of disputes such as this because a valuation is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." See Messing v. Commissioner,48 T.C. 502, 512 (1967). Moreover, we note that the parties herein have taken their positions on the basis that *256 this Court will actually decide the question of the ownership of land as between the sovereign State of Florida and petitioners and will determine what actions various government regulatory agencies would in fact take. We do not believe it appropriate for us to take definitive positions in such specialized acres, where a high degree of technical expertise is required and where taking such positions can have ramifications extending far beyond the particular issue before us. This is especially true with respect to the location of the mean high-water mark and its impact on the ownership of land as between a sovereign and its citizens. Rather, our approach will be to evaluate the conflicting evidence on these matters in the context of determining the extent to which the existence of difficulties which they engender acts as a depressant on fair market value. Cf. Mathias v. Commissioner,50 T.C. 994, 998 (1968); Farber v. Commissioner,T.C. Memo. 1974-155, affd. by unpublished opinion (2d Cir., Nov. 20, 1975). The problem of the proper role of this Court further supports our strong belief that settlement rather than trial would have been a more efficacious *257 means of disposing of this case. Respondent argues that the cotenancy owned, and thus could have effectively conveyed, only that part of Porter Island which was above the mean high-water mark. He attempts to locate this boundary line by an analysis of the vegetation on the island. The land covered by spartina, respondent contends, is below the mean high-water mark, that covered by juncus is in the transition zone, and that covered by salicornia is above the mean high-water mark. Based on an analysis of the vegetation patterns on the island, respondent concludes that the cotenancy conveyed only 5.09 acres in 1974 and 2.3 acres in 1975. Petitioner's position is that: (1) the parcels conveyed to Shorter College in 1974 and 1975 each contained 24 acres which were above the mean high-water mark; (2) even if a portion of such land is below the mean high-water mark, the cotenancy held title to such land by virtue of an 1811 Indian land grant known as the Forbes purchase. Petitioner's second argument has been specifically rejected by the Supreme Court of Florida. See Apalachicola Land & Development Co. v. McRae,86 Fla. 514, 98 So. 505 (1923). In Apalachicola Land *258 & Development Co., the court examined the chain of title relating to the Forbes purchase and concluded that private ownership of lands which were part of that purchase did not extend below the mean high-water mark. Absent a specific transfer to the contrary, "private ownership of lands bordering on navigable waters [in Florida] extends only to high-water mark." 86 Fla. at 430, 98 So. at 517. That the State of Florida continues to espouse the view expressed in Apalachicola Land & Development Co. is evidenced by a memorandum from Edward H. Cederholm, Administrator of the Florida Land Management Section, concerning the cotenancy's proposed condominium development, stating "All of the project site that is below the original mean high water line is considered to be on state-owned sovereignty land." [7]
*259 We now turn to the question as to the location of the mean high-water mark. The parties have introduced into evidence a map delineating the vegetation patterns of the island. As calculated by respondent's appraiser, Richard F. Farmer, Jr., in respect of the 24 acres conveyed in 1974, 5.09 acres are covered by juncus and no portion by salicornia, in respect of the 1975 parcel, 0.75 acres are covered by salicornia and 1.55 acres by juncus. The map shows that the vegetation on the remainder of the transferred parcels is spartina. Both Ronald H. Silver, an employee of the Corps of Engineers, and Dr. Philip F. C. Greear, head of the biology department at Shorter College, testified that land covered by spartina is generally recognized as being below mean high water. In further support of his position that land covered by spartina is below the mean high-water mark, respondent points to the Florida Administrative Code, which defines "submerged lands" for which a permit is required to dredge or fill to include lands where the dominant plant species is spartina. See Fla. Admin. Code sec. 17-4.02 (17), 4.28(2) (promulgated May 20, 1975). [8] Mr. Silver testified that juncus grows in the transition *260 zone, some below mean high water and some above it. Although the record is not entirely clear on this point, it appears that Dr Greear considers juncus to be above the mean high-water mark. Petitioner presents no probative evidence that the map does not accurately depict the vegetation on the island, that Mr. Farmer's calculation of the acreage covered by each type of vegetation is erroneous, or that spartina grows above rather than below the mean high-water mark. [9] Instead petitioner relies on the testimony of John P. Deasy, a former employee of the Florida Department of Natural Resources and the Trustees of the Internal Improvement Trust Fund, that 75 to 85 percent of the island is above mean high tide and the testimony of Jack Rudloe that the "bulk of the property is made up of Juncus." We fail to see how Mr. Deasy's statement helps petitioner, *261 since it concerns only the island as a whole and sheds no light on the 1974 and 1975 parcels in particular. In this connection, we note that, when questioned by respondent, Mr. Deasy testified that the spartina was covered with water at high tide. If Mr. Rudloe's comment that the bulk of the property is covered by juncus is meant to refer to the parcels transferred in 1974 and 1975, his statement is inconsistent with his testimony that the map accurately reflects the vegetation on the island and our view that the map shows the bulk of the subject parcels to be covered with spartina. Therefore, we give little weight to Mr. Rudloe's testimony on this point. In a further attempt to bolster his position, petitioner has introduced into evidence two maps which, he claims, show that all of the land on Porter Island is above the mean high-water mark. After carefully reviewing the maps and petitioner's supplemental brief on this point, we fail to see how the maps support petitioner's contention. *262 Respondent has convinced us that spartina covers the bulk of the subject parcels. We also are satisfied that spartina is generally considered to be below the mean high - water mark and that, for purposes of determining jurisdiction over development projects, the Corps of Engineers and Florida State regulatory agencies utilize vegetation characteristics to determine the mean high-water mark. On the basis of this record, however, we decline to hold that the cotenancy did not own, and thus could not effectively convey, any of the land which was covered by spartina. To be sure, the record does contain data concerning the mean high tide at Porter Island from the National Ocean Survey, the Federal agency charged with making this determination. But we find the record lacking sufficient probative evidence to enable us to determine the mean high tide in respect of either of the two 24-acre tracts involved herein. Moreover, we note that, while Federal and state regulatory agencies may use vegetation patterns as an indication of the mean high-water mark with respect to determining jurisdiction over development projects, that jurisdiction does not appear to depend upon whether the state, *263 the Federal government, or private parties own the land in question. Nor have we discovered any cases where vegetation patterns have been considered sufficiently accurate to determine the location of the mean high-water mark for ownership purposes. [10]
In sum, the most we can or are willing to conclude is that there is substantial doubt in respect of private ownership of land covered by spartina, that a substantial portion of the acreage involved herein is so covered, and that, as a consequence, there is a cloud on petitioner's title which operates as a significant depressant on the fair market value of the land. [11] Cf. Mathias v. Commissioner,supra;Farber v. Commissioner,supra.
*264 We now turn to an analysis of the evidence presented by each party in support of the dollar value claimed for the land in question. Petitioner has the burden of proving that the fair market values of the 1974 and 1975 tracts are in excess of $24,000 ($1,000 per acre) and $19,200 ($800 per acre), respectively. Rule 142(a). Respondent has the burden of proving that the parcels' fair market values are less than those amounts. Rule 142(a). In support of his position, petitioner has introduced three appraisal reports utilizing the development method of valuation -- one by Kirkland & Company (the Kirkland report) and two by Julian Diaz, Jr. Respondent argues: (1) because W. Talmage Kirkland or Quentin O. Ball, Jr., preparers of the Kirkland report, did not testify at trial and respondent did not stipulate to their qualifications as experts, the Kirkland report should be considered only as the opinion of a lay witness; (2) the development concept of valuation should be used only when comparable sales do not exist, and such is not the case here; (3) the Diaz reports contain several errors *265 in the application of the development method of valuation; (4) petitioner's appraisals do not indicate the fair market values of the land because they are based on the erroneous premise that the land can be developed. Because we agree with respondent's fourth argument, we find it unnecessary to address his first three contentions. [12]
We have no doubt that petitioner's valuation *266 of the land in question as worth $45,000 per acre is grossly exaggerated. [13] The Kirkland report valued the spoil bank area at $55,000 per acre on the assumption that those 40 acres could be developed with 432 condominium units. Mr. Boutwell estimated the cost of providing utilities (the existence of which the Kirkland report assumed) and the cost of fill to bring the "entire site" to developable grade at approximately $10,000 per acre. [14] Thus, subtracting the $10,000-per-acre costs from the $55,000 value supplied by Kirkland, petitioner arrived at the value he used on his 1974 and 1975 tax returns. Assuming that the Kirkland report accurately reflects the fair market value of the 40-acre spoil bank area, [15] we do not think its conclusion as to fair market value can be extended to the marshland contributed to Shorter College. Based on the testimony of Jean Tolman, a former employee of the State of Florida who worked for the Trustees of the Internal Improvement Trust Fund, the Department of Natural Resources, and the Department of Environmental Regulation, and Ronald Silver of the Corps of Engineers, both of whom we observed to be knowledgeable and credible witnesses, we are *267 convinced that it was extremely doubtful that the necessary state and Federal permits to develop the marshland could have been obtained. *268 Like the Kirkland report, the appraisals of Mr. Diaz are also premised on the concept that the marshland could be developed. Mr. Diaz's first report was based on the assumption that the highest and best use for the marshland would be its development for single family residential purposes. This report valued the 1974 parcel at $465,000 ($19,375 an acre) and the 1975 parcel at $400,000 ($16,667 an acre). Mr. Diaz's second report assumed that the parcels would be developed pursuant to the "Baldwin Concept," an ecologically sensitive residential development built on piles. This report valued the 1974 tract at $264,000 ($11,000 per acre) and the 1975 tract at $312,000 ($13,000 per acre). Again, in light of Ms. Tolman's and Mr. Silver's testimony, we are far from convinced that the necessary permits could have been obtained to fill, dredge, or drive piles into the marshland. Absent such permits, the development on which Mr. Diaz's reports were premised could not have taken place. We also note that the Kirkland and Diaz reports are premised on developing the entire 24 acres of each of the 1974 and 1975 tracts. As we have discussed above (see pp. 10-14, supra), there is a serious *269 cloud on the title of many of those acres. Mr. Diaz's second report also contains a tabulation of nine sales in Wakulla and Franklin Counties which petitioner contends are of comparable land and support his contention as to the land's value. The little information with which Mr. Diaz has provided us is insufficient to convince us that the sales are of comparable land. We think it can clearly be inferred that many of the sales involve land on which developments were and could be planned; in light of Mr. Diaz's conclusion that the highest and best use of the subject land was for residential purposes, we think it likely that all the so-called comparable sales involve developable land. Furthermore, some of Mr. Diaz's sales took place as late as 1979. In the absence of evidence indicating that land values remained constant from 1974 through 1979, we consider sales occurring in 1979 as too remote to shed much light on the price at which the parcels would sell in December of 1974 and 1975. Petitioner argues that, if statutes and regulations prohibit development of the land, such prohibition amounts to a taking without just compensation. He stresses that he is "not now raising taking *270 as a constitutional issue." Rather, he is "incorporat[ing] the taking idea as another tool in arguing for the fair market value of the * * * property." Assuming arguendo that the land transferred in 1974 and 1975 was owned by petitioner rather than the State of Florida and that the regulations amount to a "taking," petitioner has not articulated how the fact that an uncompensated taking has occurred bolsters his determination of the land's value. In support of his position as to the parcels' fair market value, respondent urges us to consider: (1) the prices at which Porter Island was purchased and sold during the three-year period preceding the first conveyance to Shorter College; (2) the valuation reports of respondent's expert witnesses, Richard F. Farmer, Jr., and Alan N. Sayford. Mr. Farmer's report, which formed the basis for respondent's deficiency notice, concluded that the highest and best use for the land is as a game and wildlife refuge and that the 1974 tract was worth $24,000 ($1,000 an acre) and the 1975 tract was worth $19,200 ($800 an acre). Mr. Farmer analyzed two sales, one agreement to sell, and one offer to purchase mixed marshaland and highland. [16] The *271 parcels of land involved were located near Porter Island and ranged in size from 30 to 60 acres. The transactions analyzed by Mr. Farmer occurred in 1974, 1975, and 1976. The land involved in the four comparable sales changed hands at an arithmetic mean price of approximately $1,780 per acre. [17] Apparently, Mr. Farmer felt that, because the sales involved both marshland and highland, $1,780 per acre did not reflect the value of the marshland. Mr. Farmer determined that the marshland portion of the "comparable" sales changed hands at a range of $600 to $1,000 per acre while the highland had a value per acre of approximately $1,200. While this breakdown of price between marshland and highland accounts for two of the sales, it does not appear to reflect the market realities of the two remaining sales. Parcels of land which sold for $180,000 and $45,000 should have been sold for $63,000 and $33,400, respectively, if Mr. Farmer's allocation of prices between marshland and highland was correct. [18] Mr. Farmer has not explained the discrepancy between his projected prices and the actual prices. *272 Mr. Sayford examined twelve sales which took place between March 1970 and December 1977. The parcels of land were located in Gulf, Franklin, Wakulla, Taylor, and Levy Counties and ranged in size from 100 to 3,379 acres. Mr. Sayford apparently considered such large tracts of land in order that he could appraise the entire Porter Island rather than merely the tracts transferred to Shorter College. He concluded that the fair market value of the island was $16,000 (400 acres at $400 per acre) [19] and that the 1974 and 1975 tracts were each worth $9,600 (24 acres at $400 per acre). Additionally, Mr. Sayford examined smaller parcels of low and wet land, ranging in size from 30 to 50 acres, and concluded that the dollar value per acre at which these smaller parcels sold was consistent with that at which the larger parcels sold. We are unconvinced that Mr. Sayford's *273 report accurately reflects the land's fair market value. He has not explained why Palm Shores paid $461,000 in December 1972 and the cotenancy paid $467,000 in July 1973 for land which he claims was worth $160,000 in December 1974 and 1975. Additionally, many of the parcels relied on by Mr. Sayford do not have access as good or locations as favorable as do the subject parcels. The "comparable sales" relied on by Mr. Sayford took place from 1970 to 1977. Although he places little weight on a sale occurring in December 1977 because it was too far removed from the valuation dates, he places great weight on several sales occurring in 1970 without providing us any guidance as to why those sales are likewise not too far removed from the valuation date. We have also considered the prices at which Porter Island was bought by Palm Shores, $461,000, and sold to the cotenancy, $467,000. "Where sales of the property to be valued have been made at or about a crucial date, they are preferred as evidence of value rather than opinion." Tripp v. Commissioner,T.C. Memo. 1963-244, affd. 337 F.2d 432 (7th Cir. 1964). Neither of the parties has persuaded us that *274 anything occurred which significantly affected real estate prices in the area from 1972 and 1973 to 1974 and 1975. See Tripp v. Commissioner,supra.Nor is there any evidence that the $461,000 and $467,000 do not represent prices arrived at in arm's-length transactions. We do not believe, however, that the fair market value of each of the 1974 and 1975 tracts can be determined by merely multiplying $467,000 by 24/521. [20] The record convinces us that the highland, particularly the 40-acre spoil bank area, has a greater fair market value per acre than the marshland.Also, an allocation of the $467,000 price would have to reflect the fact that the 121 acres north of Cut Off Creek were purchased subject to a cloud on title. The record does not contain sufficient evidence to permit us precisely to allocate the $467,000 purchase price to the various types of land which make up the island. Nevertheless, we believe that a rough ceiling on the fair market value of each of the subject parcels is $28,020. [21] For the following reasons, we believe that the parcels' fair market value is less than this ceiling: (1) the fair market value per acre of the high and dry *275 land purchases is greater than that of the marshland; (2) there is a serious question as to the ownership of much of the land conveyed in 1974 and 1975 and this operates as a serious depressant on the parcels' fair market values (see pp. 10-14, supra); (3) some portion of the $467,000 purchase price is properly attributed to the 121 acres north of Cut Off Creek. [22]
*276 It is obvious that there are great variances between the experts' estimates of the fair market value of the land and that there are, in our opinion, differences in each of the valuation reports and the testimony of the valuation experts. We have stated that petitioner's estimates based on the Kirkland and Diaz reports are grossly excessive. See p. 16, supra. On the other hand, as previously indicated, we do not believe that Mr. Sayford's appraisal report accurately values the land in question.See pp. 21-22, supra. In view of the foregoing and on the basis of our evaluation of the record as a whole, including the testimony of the witnesses whom we saw and heard, we conclude that neither party has carried his burden of proof. See pp. 14-15, supra. Accordingly, respondent's determination of the parcels' fair market values as set forth in the notice of deficiency ($24,000 for 1974 and $19,200 for 1975) must stand and petitioners are entitled to deduct 1/35th of each of these amounts. Decision will be entered under Rule 155.
Footnotes
1. Respondent's amended answer is unclear as to whether the increased deficiency is $341.50 or $342.50 for 1974 and $274 or $274.50 for 1975. Our holding on the valuation issue makes it unnecessary for us to resolve this discrepancy. ↩
2. The 1973 deficiency is no longer in issue.↩
3. Pamela A. Walker is a party to this action only by virtue of having filed a joint return with her husband and all references to petitioner will be to James A. Walker.↩
4. The term "cotenancy" is used for convenience only and is not meant to be descriptive of the legal relationship of the participants.↩
5. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
6. Prior to July 1975, marshland development was regulated by three state agencies: the Trustees of the Internal Improvement Trust Fund, the Department of Pollution Control, and the Department of Natural Resources. In July 1975, the regulation of marshland development was given to a new agency, the Department of Environmental Regulation.↩
*. The parties have stipulated the cotenancy interests in 450 acres. Although they have shed no light on how they arrived at a total acreage of 450, it is possible that it represents the total acreage of Porter Island (521 acres) less the acreage donated in 1974 through 1976 to Shorter College (72 acres).↩
7. See also Article 10, section 11, of the Florida Constitution, which provides: Sec. 11. Sovereignty lands. The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale or private use of portions of such lands may be authorized by law, but only when not contrary to public interest.↩
8. The Florida Administrative Code also defines land covered by juncus as submerged lands. See Fla. Admin. Code sec. 17-4.02(17) (promulgated May 20, 1975). Respondent has not argued that juncus grows below the mean high-water mark. Rather, he concedes that, for purposes of this litigation, juncus grows in the transition zone.↩
9. In fact, those witnesses called by petitioner who were questioned on the subject testified that the map was representative of the vegetation on the island and that spartina is generally considered to be below mean high tide.↩
10. In this connection, we note from Mr. Silver's testimony that vegetation characteristics are simply "quick and dirty" methods for determining the mean high-water level in the absence of engineering data.↩
11. We note that the appraisal report of respondent's expert, Mr. Farmer, states that the elevation of each of the 24-acre parcels is above the mean high-water mark. At trial, Mr. Farmer explained that the statement was based on a reading of the legal description of the parcels contained in the indentures which states that each parcel is 24 acres more or less and implies that the lands' perimeter is the mean high-water mark. On this basis, we do not believe that respondent is in any way bound by the comment in Mr. Farmer's valuation report.↩
12. Florida law provides that no person shall appraise real property in Florida "without being the holder of a valid and current [Florida real estate broker's] license * * *." Fla. Stat. Ann. secs. 475.42(1)(a), 475.01(3)↩ (West 1981) (repealed) 1979). At trial, respondent stated his position that, because Mr. Diaz did not hold a Florida real estate broker's license, he was incompetent to give an appraisal of the land. Respondent's objection was overruled, although the Court stated that this factor might go to the weight of Mr. Diaz's testimony. In any event, our disagreement with Mr. Diaz's opinion as to the parcels' fair market values would be the same even were he to hold a Florida broker's license.
13. Indeed, petitioner, in his reply brief, claims only $11,000 per acre for the tract contributed in 1974 and $13,000 per acre for the tract contributed in 1975 based on the second Diaz report. ↩
14. It is not entirely clear whether the cost per acre of fill necessary to bring the "entire site" to developable grade refers to the cost of filling the entire island or only the cost of filling the spoil bank area. ↩
15. We are constrained to note that we believe the fair market value of the spoil bank area was not $45,000 per acre on November 11, 1974 (the date of the Kirkland report). The 432 condominium units were never built and even the application for a permit preliminarily approved by Wakulla County was obtained to build only 248 units. Furthermore, the cotenancy purchased the entire 521 acres of Porter Island in 1973 for $467,000. This is no evidence that the value of the land skyrocketed in less than two years to such an extent that in 1974 the cotenancy could sell the 40-acre spoil bank area for $1,800,000 ($45,000 per acre X 40 acres).↩
16. Mr. Farmer's report refers to these four transactions as "sales" and we will do likewise for convenience. ↩
17. We note that one of the "sales" was actually an unaccepted offer. Mr. Farmer states that the owners subsequently wished they had accepted the offer, and he treats the offer price as a sales price. ↩
18. For purposes of these calculations, we have used $1,000 per acre as the price allocated to the marshland.↩
19. The stipulation of facts describes Porter Island as containing 521 acres. It is not entirely clear why Mr. Sayford used 400 acres as the size of the island. One explanation may be that when the cotenancy purchased the island it appears that 121 of the acres was subject to a cloud on title. See pp. 2-3, supra.↩
20. Because the prices paid for the island by Palm Shores and the cotenancy are so close, for purposes of our discussion we will assume both transactions took place at $467,000. ↩
21. We arrived at this figure by multiplying $467,000 by 24/400. The 24 reflects the maximum↩ acreage contributed to Shorter College in each of the years at issue. By using 400 acres as the denominator, we have allocated no part of the purchase price to the 121 acres with title defects. 22. The day after the cotenancy purchased Porter Island for $467,000, petitioner purchased a 1/35th interest in the cotenancy for $20,000. The price paid by petitioner for his cotenancy interest should not be interpreted as an indication that the fair market value of Porter Island was actually $700,000 (35 X $20,000) on July 12, 1973.The record indicates that a portion of the money paid by the cotenants was to be, and was, used for cotenancy operating expenses (e.g., interest on indebtedness, legal fees, appraisal reports, taxes, insurance). Additionally, the record does not report the inference that each cotenant purchased his interest for cash; Mr. Boutwell, for example, received his interest in exchange for his performance of engineering services on behalf of the cotenancy. A similar analysis applies to the prices at which cotenancy interests were purchased in 1977 (see p. 6, supra↩).