T.C. Memo. 2011-94

UNITED STATES TAX COURT

ESTATE OF JAMES J. MITCHELL, DECEASED, WHITTIER TRUST COMPANY,
EXECUTOR AND TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17351-09.              Filed April 28, 2011.


John F. Ramsbacher, John W. Prokey, and Dennis I. Leonard,
for petitioner.

Trent D. Usitalo and Nathan H. Hall, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent determined a $10,177,566

deficiency in the Federal estate and gift taxes of the Estate of

James J. Mitchell (the Estate).  The deficiency related to the

valuation of interests in five real properties, 10 paintings and

other various assets held by the Estate.  The parties have resolved all the issues except the valuation of two real properties and two paintings.  The values of the two real properties consist of the 95-percent interest in each property owned by the James. J. Mitchell Trust (Mitchell Trust) and the 5-percent interests James J. Mitchell (decedent) gifted to his sons' trust six days before his death.  We are asked to determine the fair market values of 95-percent interests owned by the Mitchell Trust as of January 31, 2005 (valuation date)[1] and the 5-percent interests gifted to decedent's children as of January 24, 2005 (transfer date).[2]  We are also asked to determine the fair market values of two paintings owned by the Mitchell Trust as of the valuation date.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.  Decedent died as a resident of Los Olivos, California on January 31, 2005.  Whittier Trust Company (Whittier Trust), the executor and trustee of the Estate,

---

[1]The parties agree that the valuation date for decedent's property interests is Jan. 31, 2005, the date of decedent's death.

[2]The parties agree that the valuation date for the 5-percent interests gifted to decedent's children is Jan. 24, 2005, the date of transfer from the Mitchell Trust to a trust for decedent's children.

had its principal place of business in South Pasadena, California at the time it filed the petition.

The Mitchell Family and the Mitchell Trust

Decedent was born into a prosperous California family in 1944. His father was a co-founder of United Airlines and married to Lolita Armand, heiress to a famed Chicago meat packing family. Decedent's parents accumulated a sizeable fortune and bequeathed a great deal to him, including American Western art by such famous artists as John Gamble, Frederic Remington (Remington) and Charles Marion Russell (Russell). It is unknown when or from whom his father acquired the paintings. Decedent's father crated the paintings at a general storage facility where they remained for over 30 years. The paintings were not discovered until after decedent's death. It is unclear whether decedent ever knew the paintings were in storage. It is further unclear whether decedent ever thought they were of any value. The paintings are currently being professionally stored at Art Pack, Inc., a securely monitored and climate-controlled fine arts storage facility.

Decedent also inherited several real properties, including an oceanfront property at 1695 Fernald Point Lane in Santa Barbara, California (the Beachfront Property) and a 4,065-acre ranch along Refugio Road in Santa Ynez, California (the Ranch). As an adult, decedent spent little time at either the Beachfront

Property or the Ranch. He lived in the San Francisco Bay area, which was more than a 5-hour drive from the properties. Decedent did, however, have a great appreciation for both properties. Decedent grew up on the Beachfront Property, and had many fond childhood memories of the property. Decedent prized the Ranch not only for its size, but also for its rich history. In the 1930s decedent's father started a famous riding group called the Rancheros Vistadores. The group's purpose was to revive the old California Western way of life by having a week-long horse ride through the Ranch. Many famous individuals have been members of the Rancheros Vistadores, including President Ronald Reagan and Walt Disney. The ride continues to attract 500 to 700 Rancheros Vistadores every year. Decedent inherited the Beachfront Property and the Ranch subject to leases executed by his father, and decedent determined to continue the leases to keep ownership of the real properties in the Mitchell family.

Decedent had a successful life in his own right. He was well-educated and worked as the business editor of the San Jose Mercury News. He married Susan Sutton, a prominent bankruptcy attorney, and they adopted two sons. As a result of his inherited and self-made wealth, decedent accumulated many valuable assets. He determined it would be in his family's best interest if he placed his assets in a revocable living trust. He

transferred all of his property interests to the Mitchell Trust and named himself as trustee.

Decedent's wife unexpectedly passed away in 2002, and in 2004 he learned that he had cancer. He thereafter amended the Mitchell Trust and named Whittier Trust as trustee. Decedent wanted to pass both real properties to his sons but wanted to ensure that his sons kept the properties in the family. Accordingly, he included provisions in the Mitchell Trust to keep his sons from receiving outright ownership of the real property until the youngest son attained the age of 45. Decedent gifted a 5-percent interest in both the Beachfront Property and the Ranch to a trust for his sons' benefit (children's trust). The Mitchell Trust retained a 95-percent interest in both real properties. Decedent passed away shortly thereafter. His two teenage sons were orphaned at his death.

The Estate consists of oil and gas interests, jewelry, interests in five real properties and 12 paintings. At issue here are the Estate's interests in the Beachfront Property, the Ranch, "Casuals on the Range" by Remington (Remington's Casuals) and "Creased" by Russell (Russell's Creased) (collectively, the property at issue).

The Beachfront Property

The Beachfront Property is a single-family, oceanfront property located in the exclusive community of Montecito,

California, near Santa Barbara.  The property is a gated residence that consists of approximately 1.78 acres and a huge backyard with 167 feet of ocean frontage.  The property includes a 4,000 square foot house, a 600 square foot guest house and a 930 square foot carport.  The estimated annual property tax was only $7,522 in 2005 because the house had not been sold for several decades.[3]

Decedent began leasing the Beachfront Property shortly after his father's death in 1987.  Leasing the property accomplished decedent's goal of keeping the property in the Mitchell family.  It also transferred the cost of upkeep to the property's tenants and provided income to decedent and his family.  Many different tenants lived in the property over the 15-year span from the time decedent inherited the property until he learned of his cancer.  In 2002 decedent leased the Beachfront Property to Mark and Lynda Schwartz.  The Schwartzes lived in Los Angeles at the time and wanted a weekend and summer home in the more tranquil Santa Barbara area.  The Schwartzes quickly developed a strong emotional connection to the Beachfront Property and decided to make it their permanent home.

---

[3]California Proposition 13 generally limits annual increases in base year value of real property to no more than two percent, except when property changes ownership or undergoes new construction.

The Schwartzes tried to purchase the Beachfront Property from decedent on several occasions. Decedent rebuffed their offers, but agreed to a long-term lease shortly before he died. The Schwartzes and decedent negotiated a 5-year lease, with three optional 5-year extensions exercisable unilaterally by the Schwartzes for a total of 20 years (Schwartz lease). They agreed to $15,000 monthly rent for the first six months of the lease, which would increase to $16,750 per month in July 2005 and then increase 3.5 percent annually. Annual rent for the first year was approximately $190,000. All rent was prepaid in an annual lump-sum installment every January 1.

The Schwartzes and decedent shared responsibility for property expenses. The Schwartzes negotiated the right to renovate the main house on the Beachfront Property, subject to decedent's approval. The house had not been renovated in over 30 years, so the Schwartzes desired to, and eventually did, spend approximately $200,000 to renovate the house. The Schwartzes also negotiated the right to sublet the property. They hoped that either decedent would eventually agree to sell to them or they could sublet the property for a profit.

The Ranch

The Ranch encompasses 4,065 acres, making it one of the largest ranches in the Santa Ynez Valley of Santa Barbara County, California. The Ranch's diverse terrain makes much of the land

difficult to work.  The ranch is the steepest ranch in Santa Ynez Valley, and much of the property is covered with trees and brush. Only half of the land is useable for agriculture or livestock grazing.  There are two houses on the Ranch property.  The primary house is 1,760 square feet with three bedrooms, and the other house is 1,150 square feet with two bedrooms.  The houses are approximately 70 years old and in fair to poor condition.

Don and Sue Hanson (the Hansons) began leasing the Ranch from decedent's father in 1980.  The Hansons, both graduates of Stanford University, have been life-long ranchers and used the property both for living and business purposes.  Mr. Hanson raised cattle on the Ranch during the winter months and then transported them to the Hansons' ranch in Wyoming during the summer months.  He would then sell all his cattle in the fall.

The Hansons signed a 5-year lease with decedent's father in 1980 with a right to renew the lease at the end of the term.  The Hansons found the property very useful for their cattle business and continued to renew the lease for 5-year terms with decedent's father and then with decedent.  In 2004 the Hansons and decedent negotiated a 5-year lease, with four optional 5-year extensions exercisable unilaterally by the Hansons for a total of 24 years and nine months (Hanson lease).  The Hansons' rent was $32,000 a year beginning in 2005, increasing $1,000 per year.  The Hansons bore responsibility for any property expenses, except decedent

paid the property taxes. The Hanson lease satisfied the Hansons' desire to retire on the Ranch and decedent's goal of keeping the property leased and maintained until it would be distributed to his sons outright.

Remington's Casuals

Remington painted Remington's Casuals in 1909. Remington is regarded as one of the greatest artists and sculptors of the American West, having created approximately 3,000 drawings and paintings and 22 sculptures during his career. He developed an impressionist style later in his life, which can be seen in Remington's Casuals. His later works are considered his most refined for their great attention to detail and convincing depictions of western gear.

Remington's Casuals is an 18- by 26-inch oil on canvas depicting a cowboy and an Indian talking on horseback in a pastel-colored landscape. An expansive mesa forms the backdrop and marks the horizon line. The figures in the painting are fixed in their poses, rigid and staid. Remington signed and dated the lower right corner of the painting. The painting is thought to have been commissioned by a Chicago art dealer for a private purchaser. It is unknown how or when decedent's father received the painting.

Russell's Creased

Russell painted Russell's Creased in 1911. Russell was known as "the cowboy artist" because he developed inspiration for his paintings from his work as a cowboy, trapper and wrangler. His paintings often depicted the difficulties of surviving and taming the American West. He completed approximately 4,000 works, including paintings, watercolors and sculptures.

Russell's Creased is a 28- by 23-inch watercolor illustrating a cowboy, two horses and a dying elk. The painting depicts a wounded elk struggling to survive after being shot by the cowboy. Snow-topped mountains provide the background for the action scene. Russell signed and dated the lower left corner of the painting. No one purchased Russell's Creased when it was completed. It is unknown how or when decedent's father received the painting.

The Estate's Estate Tax Return

The Estate timely filed a Federal estate tax return. The Estate reported a $17,016,944 gross estate with a $6,916,919 total transfer tax. The Estate valued the separate interests in the Beachfront Property at $5,881,450 for the 95-percent interest owned by the Mitchell Trust and $241,600 for the 5-percent interest gifted to the children's trust. The Estate valued the separate interests in the Ranch at $2,570,000 for the 95-percent interest owned by the Mitchell Trust and $123,750 for the 5-

percent interest gifted to the children's trust.  The Estate also valued Remington's Casuals at $400,000 and Russell's Creased at $300,000.

Respondent's Examination and Tax Court Proceedings

Respondent examined the Estate's Federal estate tax return and determined that the Estate underreported the fair market values of several real properties and several paintings. Respondent timely issued the Estate a deficiency notice that assigned higher values to the properties, including the properties at issue.  Respondent determined that the fair market value of the 95-percent interest in the Beachfront Property was $12,918,578 and the 5-percent interest gifted to the children's trust was $435,153.  Respondent determined that the fair market value of the 95-percent interest in the Ranch was $10,950,371 and the 5-percent interest gifted to the children's trust was $432,251.  Respondent valued Remington's Casuals at $2 million and Russell's Creased at $2.6 million.

Whittier Trust, as executor of the Estate, filed the petition with this Court contesting the entire deficiency.  The parties have been able to resolve all the valuation issues and other estate tax issues, but still dispute the fair market value of the two paintings and two real properties.  The parties stipulated that 19-percent and 32-percent fractional discounts should be applied to the 95-percent and 5-percent leased-fee

interests in the Beachfront Property, respectively.  The parties also stipulated that 35-percent and 40-percent fractional discounts should be applied to the 95-percent and 5-percent leased-fee interests in the Ranch, respectively.

OPINION

We are asked to determine the fair market value of two pieces of real estate and two pieces of art.  We appreciate that valuing real property and art can be an ambitious task.  Both real property and art are unique and infrequently exchange hands.  Moreover, the value of art, like beauty, often lies in the proverbial "eye of the beholder."

This estate and gift tax valuation case illustrates the difficulty in ascertaining fair market value, the quintessential fact question.  The parties have abandoned their valuations reported on the Federal estate tax return and determined in the deficiency notice.  Both parties advanced at trial different valuations of the property at issue.  We shall consider each party's valuation in turn.  We begin by considering the burden of proof.

I.  Burden of Proof

In general, the Commissioner's determinations in the deficiency notice are presumed correct, and the taxpayer has the burden of proving that the Commissioner's determinations are in

error.  See Rule 142(a);[4] <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  The burden of proof may shift to the Commissioner with respect to a factual issue relevant to a taxpayer's tax liability, however, if the taxpayer introduces credible evidence and establishes that he or she substantiated items, maintained required records and fully cooperated with the Commissioner's reasonable requests.  Sec. 7491(a)(1) and (2)(A) and (B).

The Estate filed a motion to shift the burden of proof to respondent.  After reviewing all of the evidence presented, we have found that resolving this case does not depend on which party bears the burden of proof.  The parties adduced testimony and offered exhibits supporting their respective positions. Accordingly, we base our conclusions upon the preponderance of the evidence rather than an allocation of the burden of proof. See <u>Estate of Jorgensen v. Commissioner</u>, T.C. Memo. 2009-66; <u>Estate of Harper v. Commissioner</u>, T.C. Memo. 2002-121.  We next consider the valuations of the property at issue beginning with a brief summary of the estate tax.

II.  <u>Estate Tax Valuations Generally</u>

The value of a decedent's gross estate includes the fair market value of the property owned by the decedent on the date of

---

[4]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the date of decedent's death, unless otherwise indicated.

death.  Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs.  Fair market value is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under compulsion to buy or to sell.  See sec. 20.2031-1(b), Estate Tax Regs.  Morever, the value must reflect the highest and best use of the property on the valuation date.  Estate of Kahn v. Commissioner, 125 T.C. 227 (2005).

Both parties relied extensively on expert opinions to support their differing views on the fair market values of the subject properties.  We evaluate the expert valuation opinions in light of the expert's qualifications and all other evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We may adopt all or none of the expert's methodology or value conclusions.  See Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938); Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985).  We must carefully consider all the facts, weigh all relevant evidence and draw appropriate inferences and conclusions in determining fair market value.

III. Real Property Interests at Issue

We now consider the value of the 95-percent and 5-percent interests in the Beachfront Property and the Ranch.  The parties agree that the real property interests at issue are leased-fee

interests in contrast to a fee simple interest.  A leased-fee interest describes the landlord's rights in leased property, including the right to receive lease payments and the reversionary interest when the lease expires.  Marks v. Commissioner, T.C. Memo. 1985-179; Appraisal Institute, The Appraisal of Real Estate 114 (13th ed. 2008).  An appraiser values a leased-fee interest subject to the actual lease and the actual tenant, rather than on hypotheticals.  See Estate of Proctor v. Commissioner, T.C. Memo. 1994-208.

The parties' experts used different valuation methods for approximating the fair market values of the leased-fee interests of the real properties at issue.  The Estate's experts calculated the leased-fee interests using the income capitalization method, whereas respondent's expert applied a novel leased buyout method. The income capitalization method values income-producing property by estimating the present value of anticipated future cash flows, that is, lease payments and the reversionary interest.  Shepherd v. Commissioner, 115 T.C. 376, 390 n.13 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).  The appraiser selects an appropriate lease period for the property, forecasts future cash flows and chooses an appropriate discount rate to convert the future cash flows into a present value.  The applicable discount rate takes into account the inherent risks of real estate ownership and competitive alternative investments.  An increment is added to a

base rate to adjust for risk by compensating for the extent of evaluated risk. Appraisal Institute, supra at 114.

Respondent's experts stated that a leased-fee interest under the lease buyout method equals the real property's fee simple absolute value less the amount a landlord would have to pay to buy out a tenant (buyout amount). The buyout amount includes, among other things, a return of advance payments and deposits as well as the tenant's costs to terminate the lease and find another similar property to rent. We will consider both methods in determining the fair market values of the leased-fee interests of the real properties at issue.

Moreover, the Estate's expert reports submitted at trial valued the real properties at lower values than the Estate reported on the Estate tax return. We lack jurisdiction, however, to find that the values were lower than that reported on the Estate tax return. See LTV Corp. v. Commissioner, 64 T.C. 589, 595 (1975). The only issue before us is whether there is a deficiency. We will consider each expert's report in determining whether the values of the real properties at issue are equal to or higher than the amounts reported on the Estate tax return.

The parties stipulated that the fair market values of the 95-percent and 5-percent leased-fee interests in the real property at issue should be based on each property's 100-percent leased-fee interest discounted by stipulated fractional amounts.

Accordingly, we must first determine the 100-percent leased-fee interest value of the real properties at issue to determine the value of the 95-percent interests owned by the Mitchell Trust and the 5-percent interests gifted to the children's trust. We will then apply the parties' stipulated fractional amounts to determine the values of the properties for Estate tax purposes.

A.    The Beachfront Property

We begin by considering the 100-percent leased-fee interest value of the Beachfront Property. Both parties submitted expert reports providing valuations of the 100-percent leased-fee interest. The Estate presented expert reports and testimony from James Hammock (Mr. Hammock) and John Thomson (Mr. Thomson). Mr. Hammock and Mr. Thomson are California-certified general appraisers and members of the Appraisal Institute, which has the highest credential level for an appraiser. Both experts have experience valuing residential and commercial property in the Santa Barbara area. Respondent offered expert reports and testimony from Keith Andersen (Mr. Andersen), a real estate appraiser and member of the Appraisal Institute with experience valuing property in the Santa Barbara area.

The Estate's experts valued the 100-percent leased-fee interest value of the Beachfront Property at $6 million to $8 million. Respondent's expert valued the 100-percent leased-fee interest value of the property at $12.5 million. The prime cause

for the experts' different valuations was the method applied for valuing the property.

### 1. Valuation Method

We now consider the proper method for valuing the 100-percent leased fee interest of the Beachfront Property. The Estate's experts applied the income capitalization method, which is the general method for valuing leased-fee interests. See, e.g., Shepherd v. Commissioner, supra; Estate of Hinz v. Commissioner, T.C. Memo. 2000-6; Kloppenberg & Co. v. Commissioner, T.C. Memo. 1986-325; Marks v. Commissioner, supra. Respondent's expert Mr. Andersen contends that appraisers generally use the income capitalization method only with respect to commercial property leases, not residential leases. Moreover, he claims the income capitalization method does not yield a value that would make economic sense because the Beachfront Property's property expenses far exceeded the rental value. He asserts that his lease buyout method should be used to value the Beachfront Property. We disagree.

Any property that generates income can be valued using the income capitalization approach. Appraisal Institute, supra at 472. Decedent treated the Beachfront Property as an investment and profited from leasing the property. Decedent never intended to live on the property or use it as his residence. The Beachfront Property had been leased to third-party caretakers for

decedent's entire adult life, and he intended to continue leasing the property to caretakers until his sons could manage the property. Moreover, the long-term leases served decedent's legitimate property management and maintenance goals and produced stable income. Decedent not only received income but also financially benefitted from having third-party caretakers maintain the property. The Schwartz lease relieved decedent from having to pay a property manager to live on the property as well as giving him someone to share all property expenses.

Respondent's expert Mr. Andersen claims that the Beachfront Property's property expenses exceeded the income generated from leasing the property. This assertion is unfounded. Mr. Andersen bases his argument on the first year's lease payments of $190,500 and his projected expenses of $150,500 for property taxes, maintenance, management and reserves. His expense calculation largely depends, however, on a reassessment of the property that would lead to a steep increase in property tax. Reassessment occurs only upon completion of new construction or sale, neither of which occurred here. Moreover, he failed to show the Court that new construction or sale would put the land to its best use. The Mitchell Trust's Federal income tax returns for 2003, 2004 and 2005 show an average of $73,200 in expenses associated with the Beachfront Property compared to approximately $190,500 in income generated under the first year of the Schwartz lease. We

find that leasing the Beachfront Property was an income-producing activity that put the land to its best use.

Mr. Andersen also argues that the income capitalization method generally is used to value commercial rather than residential property and therefore should not be used in this case. We recognize that residences are typically owner-occupied, not leased, so the income capitalization method generally does not provide the best indication of value. Here, however, decedent treated the property as an income-producing property rather than a personal residence. Mr. Schwartz frequently sought to buy it, but decedent rebuffed each offer. Decedent, however, wished to continue leasing the Beachfront Property to generate income. Decedent also saw a benefit in having the Schwartzes maintain the property and preserve it for his sons' benefit and enjoyment. We see no reason to deviate from the accepted use of the income capitalization method for valuing income-producing property like the Beachfront Property.

We further find Mr. Andersen's lease buyout analysis speculative at best. Expert testimony must be the product of reliable principles and methods. Fed. R. Evid. 702. Mr. Andersen's lease buyout method has not been accepted by any court or generally recognized by real property appraisers. In applying his lease buyout method, he estimated that the Schwartzes' advance rent payment, security deposit and moving expenses would

total between $250,000 and $2 million, which is far from an exact amount. Moreover, he had no basis for assuming that the Schwartzes would be willing to take a lease buyout. We reject the application of this method in this case. Accordingly, we find that the income capitalization method is the best method for determining the value of the 100-percent leased-fee interest of the Beachfront Property.

The Estate's experts were the only experts to submit valuations based on the income capitalization method. We therefore look to the Estate's expert reports for valuing the leased-fee interest using the income capitalization method. The Estate's experts determined that the Estate's future cash flows consisted of the lease payments from the Schwartz lease and the reversionary interest of clear title to the property when the lease expired after the 20-year term. We first consider the appropriate lease term for determining the value of the lease payments and reversionary interest.

2. Term of the Schwartz Lease for Valuation Purposes

An appraiser may be justified in concluding that a tenant will exercise options to renew a lease when the renewal terms favor the tenant. Appraisal Institute, supra at 114. Here, the lease terms patently favored the Schwartzes, who had the option to renew the lease three times, and not decedent, who was at the mercy of the Schwartzes' renewal decision and could not terminate

the lease.  Moreover, the Schwartzes lived in the house for several years, spent approximately $200,000 to renovate the house and had not expressed any desire to move as of the valuation date.  Accordingly, we conclude that a 20-year lease term is the best estimate of length for the Schwartz lease.

### 3. Present Value of the Lease Payments and Reversionary Interest

We next consider the proper calculation for determining the present value of the lease payments and the reversionary interest.  Although both of the Estate's expert analyses were appropriate, we tend to favor Mr. Thomson's methodology for estimating the present value of the anticipated future lease payments and the reversionary interest.  Mr. Thomson averaged the actual expenses reported on the Mitchell Trust's income tax returns for 2003, 2004 and 2005 and annually adjusted the expenses for inflation.  We find this to be the best expense estimate.  We also find that Mr. Thomson's 9.5-percent discount rate, the average discount rate for residential property in the Santa Barbara area, is a better discount rate than Mr. Hammock's use of the average discount rate for commercial property in the Santa Barbara area.  We therefore find Mr. Thomson's conclusion that the present value of the lease payments would be $1,329,996 for a 20-year lease term to be the most accurate.

We next consider the present value of the reversionary interest.  We begin by determining the value of the property in

fee simple absolute. Mr. Thomson did not value the property in fee simple absolute but rather used the fee simple absolute valuation prepared by respondent's expert Mr. Andersen. Mr. Hammock and Mr. Andersen used the comparable sales method to value the Beachfront Property in fee simple absolute. The comparable sales method determines value by analyzing and comparing sales of property similar to the subject property and weighing the information to reach a likely value for the land being appraised. Estate of Fawcett v. Commissioner, 64 T.C. 889, 898-899 (1975); Estate of Langer v. Commissioner, T.C. Memo. 2006-232. Mr. Hammock and Mr. Andersen valued the Beachfront Property in fee simple absolute at roughly the same amount using the comparable sales method, $14 million versus $14.5 million, and both experts selected a reasonable number of comparables. Both experts considered lot size, home improvements and ocean frontage price per foot as important comparable factors. The primary difference between the sales comparisons is that Mr. Andersen selected properties sold in 2004 and 2005, while Mr. Hammock selected properties sold in 2003 and 2004. Mr. Andersen's sales were closer in time to the valuation date. Both experts acknowledged that the property in Santa Barbara appreciated rapidly from 2002 to 2005. We find Mr. Andersen's valuation more appropriate as it included comparables sold closer

to the valuation date.  We therefore use a $14.5 million fee simple absolute valuation to calculate the reversionary interest.

Mr. Thomson calculated the present value of the reversionary interest using Mr. Andersen's $14.5 million fee simple absolute valuation.  He increased the fee simple absolute value by a 3.5-percent annual growth rate and reduced it by a 9.5-percent annual discount rate.  He noted that the reversionary interest value was inversely related to the length of the lease term, with the reversion amount decreasing as the lease term lengthened.  He concluded that the reversionary interest amount would be $4,697,779 for a 20-year lease term.  Mr. Thomson then added the present value of the lease payments to the present value of the reversionary interest and determined that the 100-percent leased-fee interest value would be approximately $6 million.  Applying the stipulated discounts to Mr. Thomson's determination, the 95-percent interest the Mitchell Trust owned had a fair market value of $4,617,000 as of the valuation date, and the 5-percent interest gifted to the children's trust had a fair market value of $204,000 as of the transfer date.

We find Mr. Thomson's estimation of the value of the Beachfront Property most persuasive.  Accordingly, we find that the Estate properly valued the Beachfront Property on the Estate tax return.

B. <u>The Ranch</u>

We now consider the 100-percent leased-fee interest value of the Ranch. The parties stipulated that a 35-percent and 40-percent fractional discount should be applied to the 95-percent and the 5-percent leased-fee interests, respectively. The Estate offered the valuation reports and testimonies of Mr. Hammock and Mr. Thomson. Respondent offered the valuation reports and testimony of Donald Bratt (Mr. Bratt), a self-employed real estate appraiser and a member of the Appraisal Institute. Mr. Bratt has experience valuing property in the Santa Ynez Valley.

The Estate's experts valued the 100-percent leased-fee interest of the property at approximately $3.5 million. Respondent's expert valued the 100-percent leased-fee interest at $20 million. Like the Beachfront Property, this sizeable valuation difference is primarily a result of the valuation methods applied.

1. <u>Valuation Method</u>

The Estate's experts assert that the income capitalization method is the best indicator of value for us to determine the 100-percent leased-fee interest value of the Ranch. Respondent's expert Mr. Bratt advocates, however, that the lease buyout method provides the best indicator. We disagree with Mr. Bratt for the same reasons we rejected respondent's expert lease buyout method to determine the value of the Beachfront Property. The Ranch had

been leased to the Hansons for 25 years.  This provided decedent with annual income and also reallocated the regular maintenance cost to third-party caretakers.  It was also consistent with keeping the Ranch in the Mitchell family.  We find that the income capitalization method should be used to determine the Ranch's 100-percent leased-fee interest value.

2.  Term of the Hanson Lease for Valuation Purposes

We now consider the appropriate lease term for determining the present value of the lease payments and the reversionary interest.  The Estate's experts analyzed the 100-percent leased-fee interest using different lease terms depending on the number of options exercised.  The lease terms patently favored the Hansons, who had the option to renew the lease four times.  Moreover, the Hansons lived on the property for 25 years and had not expressed any desire to move as of the valuation date.  We understand that Mr. Hanson's age may be a factor in determining the total lease term.  We were not, however, provided any data on his life expectancy.  Cf. Estate of Proctor v. Commissioner, T.C. Memo. 1994-208.  Accordingly, we calculate the 100-percent leased-fee interest value based on all options being exercised for a total lease of 24 years and nine months.

### 3. Present Value of the Lease Payments and Reversionary Interest

We next consider the proper calculation for determining the present value of the lease payments and the reversionary interest. For determining the present value of the future lease payments, we accept the annual lease payments, expenses and discount rate used by Mr. Thomson. Mr. Thomson considered decedent's previous tax returns and determined $15,000 as a base for expenses in 2005, which he annually adjusted for inflation. We find that Mr. Thomson's use of the 9.5-percent national discount rate on leased residential property best reflects the risks associated with investing in the Ranch and more accurately estimates the rate of return investors expect when investing in property like the Ranch. We agree with Mr. Thomson's conclusion that the present value of all lease payments would be $150,713 if all lease options are exercised.

We must also consider the proper fee simple absolute valuation for determining the value of the reversionary interest. Mr. Thomson used Mr. Bratt's comparable sales for his analysis. Mr. Hammock and Mr. Bratt valued the property using the comparable sales method, and all experts selected a reasonable number of comparable sales. The primary difference is that most of Mr. Bratt's comparable sales are located in the Santa Ynez Valley, while eight of the nine comparables Mr. Hammock selected

were located outside the Santa Ynez Valley.  Both experts agreed that property located in Santa Ynez Valley was priced much higher than other property in the area.  We find Mr. Bratt's comparable sales better indicate the fee simple absolute value of the Ranch because they were located in the Santa Ynez Valley.  Location, location, location is paramount in real estate valuation.

We do not, however, accept in toto Mr. Bratt's comparable sales methodology.  We are especially troubled by his applied appreciation rate.  Mr. Bratt determined that the property most similar to the Ranch was a 4,674-acre ranch that sold for $2,353 per acre in 1999 (Brinkerhoff Ranch).  He increased the sale price of the Brinkerhoff Ranch by two percent per month for 61 months for passage of time, for a present value of $5,224 per acre.  Mr. Bratt's valuation appreciates the Brinkerhoff Ranch by more than 100 percent in just over five years.  The Brinkerhoff Ranch had appreciated at only 4.5 percent per year the previous 20 years.  While the property value in the Santa Ynez Valley may have been appreciating rapidly between 1999 and 2005, we find no support for such extreme growth.  We also are uncomfortable with Mr. Bratt's $24 million valuation being nearly double his most comparable sale.

We find Mr. Thomson's fee simple absolute valuation using Mr. Bratt's comparable sales much more appropriate.  Mr. Thomson

recognized that there was significant growth from 2000 to 2005. He applied an average 15-percent annual growth rate to the value of the property based on the median home price appreciation in Santa Barbara County during this period. He determined the proper price per acre should be between $2,600 and $3,500, for an estimated $13 million fee simple absolute valuation. We agree with Mr. Thomson's conclusion that the fair market value of the Ranch in fee simple absolute is $13 million.

Mr. Thomson applied a 3.5-percent annual appreciation rate and a 9.5-percent discount rate to determine the present value of the reversionary interest. He concluded that the reversionary interest value would be $3.2 million if all lease options were exercised. He then added the present value of the lease payments, $150,713, to the current value of the reversionary interest, $3.2 million, to determine the 100-percent leased-fee interest amount to be approximately $3.37 million. Applying the stipulated discounts to Mr. Thomson's determination, the fair market value of the 95-percent interest in the Ranch owned by the Mitchell Trust is $2,080,975 on the valuation date, and the 5-percent interest in the Ranch owned by the children's trust is $101,100 as of the transfer date.

We find Mr. Thomson's estimation of the value of the Ranch most persuasive.  Accordingly, we find that petitioner properly valued the Ranch on its Estate tax return.

IV.  Paintings at Issue

We must now determine the fair market value of the American Western paintings Remington's Casuals and Russell's Creased on the valuation date.  Experts consider several different criteria in valuing art that are not typically used in general property valuations.  These include thematic appeal, period of work, style, overall quality, provenance,[5] condition of artwork and market conditions (collectively, the art valuation factors).

Respondent contends that the fair market value of Remington's Casuals is approximately $2.3 million and of Russell's Creased is approximately $2 million.  The Estate asserts that the fair market value of Remington's Casuals is approximately $1.2 million and of Russell's Creased is approximately $750,000.  Both parties offered expert reports and testimony to aid the Court in making its determination.  The

---

[5]"Provenance" means the origin or history of ownership of the painting.  Documented evidence of provenance for a painting can help to establish that it has not been altered and is not a forgery, a reproduction or stolen art.

parties jointly offered an expert report prepared by Virginia Blyth Hill (Ms. Hill) on the condition issues specific to Russell's Creased. Ms. Hill has over 30 years of experience as a paper conservation expert. The Estate offered the expert reports and testimonies of Nancy Escher (Ms. Escher), Catherine Gellert (Ms. Gellert) and Richard Alasko (Mr. Alasko) to support its valuations of the paintings at issue. The Estate's experts are members or candidate members of the American Society of Appraisers (ASA), certified by the Uniform Standards of Professional Appraisal Practice (USPAP) and have extensive experience valuing American Western artwork. Respondent offered the expert reports and testimonies of Peter Fairbanks (Mr. Fairbanks) and Gretchen Wolf (Ms. Wolf). Mr. Fairbanks is a member of the Appraisers Association of America and has been an art appraiser for almost 25 years, specializing in 19-century American and European paintings and traveling antiques. Ms. Wolf is an Internal Revenue Service (IRS) art appraiser, a member of the ASA and certified by the USPAP. Neither Mr. Fairbanks nor Ms. Wolf has an expertise or extensive background in American Western art.

We also received appraisals for both paintings from the IRS Art Advisory Panel (Art Panel). The Art Panel comprises 25 art experts who volunteer to assist the IRS in evaluating taxpayers'

fair market value appraisals of works of art. The IRS does not tell the Art Panel whether an item is being valued for charitable contribution purposes or estate tax purposes to ensure objectivity. The Art Panel submits its valuation to the IRS Appraisal Office, which then makes the ultimate determination of value. The Art Panel's valuation generally becomes the position of the IRS. Here, the Art Panel determined the value of Remington's Casuals to be between $600,000 and $850,000 and Russell's Creased to be between $300,000 and $1 million. The Art Panel submitted its appraisals to Ms. Wolf, the IRS staff appraiser assigned to value the paintings at issue. Ms. Wolf was concerned by the Art Panel's disparate and wide-ranging valuations, which she attributed to its inexperience in American Western art. She believed that a much higher value was warranted, which led her to prepare her own valuation report. Respondent used Ms. Wolf's valuation for purposes of the deficiency notice.

A. <u>Remington's Casuals</u>

The parties submitted three appraisals of Remington's Casuals in addition to the Art Panel's appraisal. All of the experts used the comparable sales approach to valuing Remington's Casuals. The Estate's expert Ms. Escher compared Remington's Casuals to 54 auction sales of Remington paintings between 1997

and 2005 in valuing the painting at $1.2 million.  Respondent's examination expert Ms. Wolf relied on a smaller pool of comparable paintings to reach a $2.3 million valuation. Respondent's trial expert Mr. Fairbanks considered not only public auctions but also private sales in valuing the painting at $2.2 million.

The experts agree that the positive valuation factors for Remington's Casuals include the period during which it was painted, its condition, its impressionist style, the signature on the painting and the market conditions on the valuation date. The experts disagree, however, on the proper comparable paintings and sales as well as whether the subject matter of the painting should be viewed as a positive or negative factor in the valuation.

We begin by analyzing the comparables used by the experts. Ms. Escher and the Art Panel relied only on public sales as comparables, in contrast to Mr. Fairbanks, who considered private sales.  The parties dispute whether private sales should be considered.  This Court generally finds auction prices more probative of value than poorly documented private sales.  See Estate of Scull v. Commissioner, T.C. Memo. 1994-211.  We generally look at private sales when they are well-documented. See Williford v. Commissioner, T.C. Memo. 1992-450.  Here, Mr.

Fairbanks failed to provide the exact sale prices, exact sale dates, identities of buyers or sellers, information on the condition of the paintings or discussions on provenance. He even acknowledged that he did not put great weight on the private sales. Accordingly, we focus on comparable paintings that have been publicly auctioned for purposes of valuing Remington's Casuals.

We find the value conclusions of Mr. Fairbanks and Ms. Wolf to be unreasonably high. Their $2.2 million to $2.3 million range is more than twice that of the Art Panel. Ms. Wolf expressed suspicions about the Art Panel report because the panelists were not experts in American Western art. If this were the only criterion, then the Court would only rely upon Ms. Escher as no trial or examination expert for respondent has expertise in valuing American Western art. Ms. Escher looked at all auctioned Remingtons over a 6-year period to determine the best comparables. Three of the four paintings she selected were selected by the other experts as comparables. We find that the Estate's expert's report is a better indicator of value as she exhaustively researched all sales, had expertise in American Western art and provided the most understandable report. Accordingly, we find the fair market value of Remington's Casuals to be $1.2 million.

B.    Russell's Creased

The parties submitted three appraisals of Russell's Creased in addition to the Art Panel's appraisal.  All of the experts used the comparable sales approach to value the painting and considered Russell's 1908 painting "A Disputed Trail" as a comparable.  "A Disputed Trail," a large watercolor widely recognized as one of Russell's finest works, sold at auction in 2001 for $2.31 million, which was the highest selling price of any Russell before the valuation date.  The Estate's expert Ms. Escher compared Russell's Creased to nine other Russell paintings, including "A Disputed Trail," in valuing the painting at $750,000.  She considered "A Disputed Trail" far superior to and more valuable than Russell's Creased.  Respondent's trial expert Mr. Fairbanks and respondent's examination expert Ms. Wolf viewed Russell's Creased as very similar to "A Disputed Trail," though they both viewed "A Disputed Trail" as an overall better painting.  Mr. Fairbanks valued Russell's Creased at $1.8 million and Ms. Wolf valued Russell's Creased at $2 million.

Both parties' experts agree that positive valuation factors for Russell's Creased include the period during which it was painted, Russell's signature on the painting and the market conditions on the valuation date.  The experts disagree, however, on the proper comparable paintings and sales as well as whether

the subject matter of the painting should be viewed as a positive or negative factor.

We have fully considered all of the experts' reports and testimony.  All of the experts agreed that "A Disputed Trail" was one of Russell's greatest works, and no expert claims that Russell's Creased should be considered a great work.  The Estate's expert Mr. Alasko pointed out that the painting's provenance leaves much to be desired.  No one purchased Russell's Creased when it was completed.  Ms. Hill determined that the watercolor image of the painting was in good condition.  In contrast, the paper and back boarding were irremediably poor because of weak ground wood and acidic paper pulp.  The Estate's expert Ms. Gellert testified as to the condition of Russell's Creased and determined that the surface of the painting has yellow stains because of the poor paper quality.  We place less weight on the reports of respondent's experts as they failed to adjust their valuation of Russell's Creased for its inferior status and for its poor paper quality and back boarding.

The Estate's expert Ms. Escher's appraisal contains a reasonably detailed description of nine comparables, including comments about the condition of each piece.  Moreover, she fully considers the painting's provenance and poor paper and back boarding in making her valuation.  Ms. Escher's valuation rests

squarely within the Art Panel value range of $300,000 to $1 million.  We find the Estate's expert valuation the most reasonable and well-supported.  Accordingly, we determine the fair market value of Russell's Creased to be $750,000.

V.  Conclusion

This Court applies the stipulated fractional percentages in finding that the fair market value of the Mitchell Trust's 95-percent interest in the Beachfront Property was $4,617,000 and in the Ranch was $2,080,975 as of the valuation date.  We hold that the fair market value of the children's trust's 5-percent interest in the Beachfront Property was $204,000 and in the Ranch was $101,100 on the transfer date.  We also hold that the fair market value of Remington's Casuals was $1.2 million and of Russell's Creased was $750,000 as of the valuation date.

We have considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued denying petitioner's motion to shift the burden of proof, and decision will be entered under Rule 155</u>.