T.C. Memo. 2017-40

UNITED STATES TAX COURT

ESTATE OF EVA FRANZEN KOLLSMAN, DECEASED,
JEFFREY HYLAND, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26077-09.              Filed February 22, 2017.

Kim E. Baptiste and Michael E. Swartz, for petitioner.

Jane J. Kim and Robert A. Baxer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined a $781,488 deficiency in the Federal

estate tax of the Estate of Eva Franzen Kollsman (estate).[1]  The deficiency arises

_____

[1]Unless otherwise noted, all section references are to the Internal Revenue
Code of 1986, as amended and in effect for the date of decedent's death, and all

(continued...)

**[*2]** principally from respondent's determination that the estate underreported the values of two paintings held by decedent at her death on August 31, 2005 (valuation date). After concessions,[2] the sole issue for decision is the fair market values of the paintings on the valuation date. The parties have each introduced expert reports and testimony to support their respective positions.

FINDINGS OF FACT

Some of the facts have been stipulated and, together with the exhibits attached thereto, are incorporated herein by this reference.

I. Background

Eva Franzen Kollsman (decedent), a resident of New York, died testate on August 31, 2005. Her estate was administered in New York. Her will designated Jeffrey Hyland as the executor of her estate and the distributee of its residual.[3] Mr. Hyland resided in California at the time the petition was filed.

_____

[1](...continued)
Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[2]A portion of the deficiency is attributable to respondent's determination that the estate failed to report taxable gifts made by decedent Eva Franzen Kollsman for taxable years 2002, 2003, and 2004. The estate has conceded this adjustment.

[3]Decedent's will provided for the distribution of the residuary estate to Mr. Hyland after the satisfaction of various bequests and the payment of debts, expenses, and "Death Taxes", defined to include Federal and State estate taxes.

**[*3]** II.    The paintings

    A.    Description

The estate's assets included two 17th-century Old Master[4] paintings:

(1) Village Kermesse, Dance Around the Maypole (Maypole) by Pieter Brueghel

the Younger (Pieter Brueghel), measuring approximately 21-1/2 by 29-7/8 inches,

and (2) Orpheus Charming the Animals (Orpheus) by Jan Brueghel the Elder or

Jan Brueghel the Younger or a Brueghel studio,[5] measuring approximately 19 by

27 inches.  Both are oil paintings on wood panels.  Maypole depicts the revelry of a

village festival:  Some villagers dance around a maypole as others engage in

similarly spirited pursuits.  Orpheus depicts the musician of Greek mythology by

that name playing a lyre, surrounded by an assortment of paired animals in a

sylvan setting.  Mr. Hyland inherited Maypole and Orpheus from decedent's estate.

    B.    The estate's expert's experience with the paintings

The estate's expert, George Wachter, vice president of Sotheby's North

America and South America and cochairman of Sotheby's Old Master Paintings

---

[4]The term "Old Master" refers to "a superior artist or craftsman of established reputation", especially "a distinguished painter of the 16th, 17th, or early 18th century". Webster's Third New International Dictionary 1571 (Unabridged) (2002).

[5]The parties' experts dispute whether Orpheus is properly attributed to Jan Brueghel the Elder or Jan Brueghel the Younger, an issue discussed infra pp. 35-38.

**[*4]** Worldwide, first saw the paintings at issue in 1981 during a visit to decedent's residence.  He visited her residence on several subsequent occasions over the years and saw the paintings each time.

Around the date of decedent's death, in a letter dated August 31, 2005, Mr. Wachter wrote to Mr. Hyland outlining proposed terms under which Sotheby's would handle the auctioning of Maypole and Orpheus.  He stated that the "preliminary estimates" of the sale prices the paintings would bring at Sotheby's January 2006 auction in New York City were $600,000 to $800,000 for Maypole and $100,000 to $150,000 for Orpheus.

C.    <u>Mr. Wachter's fair market value letter and proposed consignment rights agreement</u>

A few weeks later a Sotheby's employee sent a letter to Mr. Hyland dated September 28, 2005, enclosing two documents prepared by Mr. Wachter and signed on his behalf, both dated September 23, 2005.  The first took the form of a letter from Mr. Wachter to Mr. Hyland in which he stated that the fair market values of Maypole and Orpheus, "based on firsthand inspection of the property" (and without further elaboration), were $500,000 and $100,000, respectively.  This letter was subsequently attached to the estate's estate tax return.

The second document was a letter agreement, sent by Mr. Wachter to Mr. Hyland, providing terms under which Mr. Hyland would agree to give

[*5] Sotheby's exclusive rights to auction Maypole and Orpheus for five years (consignment rights agreement). The consignment rights agreement stated:

> In consideration of the work that we [Sotheby's] have done with you and Mrs. Kollsman over the past years and also our help with the donation process for the Circle of Cranach altarpiece,[6] this letter certifies that you [Mr. Hyland] agree that, if you should decide during the 5-year period beginning on the date this letter agreement is mutually executed, to offer the two pictures listed below [Maypole and Orpheus] for sale, you shall consign such property exclusively and only to Sotheby's to be offered for sale at an auction to be conducted by us.

The values of Maypole and Orpheus were described in the consignment rights agreement as $600,000 to $800,000 and $100,000 to $150,000, respectively. At some time between September 28 and October 24, 2005, Mr. Hyland signed the agreement. During the period in which the agreement was proposed and executed, Sotheby's imposed a buyer's premium that it collected and retained on any auction

---

[6]The estate's assets also included another Old Master painting, Circle of Cranach, St. Mauritius, which under the terms of decedent's will was bequeathed to the Metropolitan Museum of Art in New York City provided that the museum agreed to put it on permanent display under terms acceptable to the estate's executor. In the event that the Metropolitan Museum did not agree to terms acceptable to the executor, the painting was to be given to such other museum as the executor chose in his discretion.

**[*6]** sale equal to 20% of the first $200,000 of the "hammer price"[7] and 12% of any excess amount.[8]

### D. Cleaning of the paintings

#### 1. Engagement

Approximately three to four weeks after decedent's death, Mr. Hyland consulted with Brad Shar, vice president and general manager of Julius Lowy Frame and Restoring Co. (Lowy), regarding work to be done to the paintings. Lowy is (and was at all relevant periods) a preeminent fine art services firm specializing in fine art restoration and framing, with a client list that has included the auction houses Sotheby's and Christie's; museums such as the Metropolitan Museum of Art, the Museum of Modern Art, and the Guggenheim Museum, all in New York City, as well as the National Gallery of Art in Washington, D.C., and the Art Institute of Chicago; numerous art galleries in New York City; architects and interior designers; and the private collections of David Rockefeller, Ralph Lauren, Richard Manoogian, and Millicent Hearst.

---

[7]The "hammer price" is the winning bid at auction.

[8]The buyer's premium Sotheby's imposes on auctions sales has varied over time. When, as discussed infra p. 11, Maypole sold at a Sotheby's auction in January 2009, the buyer's premium was 25% of the first $50,000 of a bid price; 20% of any amount in excess of $50,000, up to and including $1 million; and 12% of any amount in excess of $1 million.

**[*7]**   On September 27, 2005, Mr. Hyland emailed Mr. Shar, confirming that he wished to have Lowy put new frames on Maypole and Orpheus.  By that time, the paintings had been moved from decedent's residence to Sotheby's; Mr. Hyland asked Mr. Shar to examine them there.  Mr. Hyland noted that one of the paintings had a signature in the lower left-hand corner and the other had a slight bow along the bottom and possibly the top as well.

On October 6, 2005, Lowy obtained a certificate of insurance from its insurer, which Mr. Shar forwarded to Mr. Hyland that same day to demonstrate that Lowy had insurance coverage for Maypole and Orpheus while it had custody of them.  The certificate indicated that Lowy had insurance with respect to any damage that might occur to the paintings in transit to or from, or while on, Lowy's premises.  The coverage was effective from October 6, 2005, to February 10, 2006, and insured Maypole for $1 million and Orpheus for $200,000.  Mr. Hyland determined the amounts for which Lowy was to insure Maypole and Orpheus.[9]

2.   Examination by Lowy personnel

After examining Maypole and Orpheus Mr. Shar concluded that they were dirty and should be cleaned.  He found the paintings to be covered with a heavy

---

[9]A property casualty insurance policy issued to decedent, for the period December 11, 2005, to December 11, 2006, provided insurance coverage for her residence and its contents, including the paintings at issue.  The policy insured Maypole for $600,000 and Orpheus for $80,000.

**[*8]** layer of dirt and grime that nonetheless "looked like it could be removed with relative ease". The chief conservator at Lowy, Bill Santel, who performed an initial examination of both paintings before they had been cleaned or any testing on them had been done, likewise believed on the basis of that examination that cleaning would be appropriate for both and "reasonably safe"--something he would certainly have done if he owned them. In his judgment, Maypole appeared to have been previously cleaned, though not recently. He considered Maypole "not the dirtiest painting" he had seen in his work and "a pretty good painting to be cleaned". Mr. Shar therefore suggested to Mr. Hyland that he have the paintings cleaned before framing; Mr. Hyland agreed and engaged Lowy for that purpose.

### 3. Lowy condition and treatment reports

#### a. Maypole

Lowy prepared a "condition and treatment report" concerning Maypole. The section of the report devoted to the painting's pretreatment condition (condition report), dated November 28, 2005, states that Maypole had a surface coating of "discolored natural resin" varnish. The condition report has an entry for degrees of "Surface Dirt", with the options of "Light", "Apparent", or "Heavy". "Heavy" is circled. The immediately following entry is for degrees of "Embedded Dirt", with

**[*9]** the same three options.  None of the options is circled.  Under the "Signature" entry, the condition report notes that the signature was "[b]arely visible".

The condition report was based on a two-step process Lowy employs to determine the condition of a painting:  (1) a visual examination using various forms of light and (2) a chemical detergent window test (window test) whereby detergent is applied to a small section or sections of the painting's surface.  The visual examination is nonintrusive, using ultraviolet light, x rays, and an infrared scope.  It typically enables a conservator to detect damage within a painting or previous restorations.  The window test, performed only with the client's permission, typically reveals further information about a painting's condition, including how it will clean and whether any dirt is surface or embedded.

Maypole was cleaned on December 6, 2005.  The section of the report devoted to the painting's treatment (treatment report) states that the cleaning took three hours.  The treatment report further states that the Lowy conservator used Wolbers and naphtha detergents to remove "a heavy layer of surface dirt-grease-grime-nicotine".  The treatment report notes that the conservator "did not remove varnish".

**[*10]**                    b.    Orpheus

Lowy also prepared a condition report and a treatment report concerning Orpheus. The condition report,[10] dated November 28, 2005, states that the surface coating of Orpheus was "varnished" with a "natural" (as opposed to "synthetic") varnish, with discoloration that was "apparent". The "Surface Dirt" entry has "Heavy" circled, and the options for the degree of "Embedded Dirt" are unmarked. The entry regarding "Signature" is filled out as "[n]one visible". The condition report further states under "Surface Distortions" that the painting had a "convex warp"; and elsewhere the report observes that the panel was "substantially bowed at the top and bottom".

Orpheus was also cleaned on December 6, 2005. The treatment report states that the cleaning took two hours. The treatment report further states that the Lowy conservator used Wolbers and naphtha detergents to "remove a discolored heavy dirt & grime layer (yellowed) only" and notes that the conservator "did not remove varnish".

---

[10]As with the condition report prepared for Maypole, the condition report for Orpheus was based on a visual inspection using various forms of light and a window test.

[*11]  4.  Cost and shipping

The cleaning and framing of Maypole and Orpheus cost $4,500 and $4,350, respectively. Both paintings were shipped to Mr. Hyland at his residence in California on December 21, 2005.

E.  Post-valuation-date sale of Maypole and market data

Mr. Hyland ultimately consigned Maypole to Sotheby's pursuant to the consignment rights agreement, and approximately 3-1/2 years after the valuation date Maypole sold at Sotheby's January 2009 Old Masters auction in New York for a hammer price of $2,100,000 against a presale estimate of $1,500,000 to $2 million. The total purchase price, including the buyer's premium, was $2,434,500. At the time of trial Orpheus remained in Mr. Hyland's possession.

As of the January 2009 Old Masters auction, the 10 highest sale totals for Old Masters auctions achieved by Sotheby's or Christie's in New York City were as follows:

| | | |
|---|---|---|
| 1. | Sotheby's January 2007: | $108.1 million |
| 2. | Sotheby's January 2008: | $82.5 million |
| 3. | Christie's January 2006: | $74.5 million |
| 4. | Sotheby's January 2006: | $67.8 million |
| 5. | Sotheby's January 2009: | $63.9 million |
| 6. | Sotheby's January 1998: | $53.2 million |
| 7. | Sotheby's January 1997: | $47.7 million |
| 8. | Sotheby's January 2000: | $47.5 million |
| 9. | Sotheby's January 2003: | $47.1 million |
| 10. | Christie's January 2000: | $39.3 million |

[*12] Five of the top ten were achieved between the valuation date in August 2005 and the January 2009 Sotheby's auction at which Maypole was sold.

III.    Return position and deficiency determination

The estate timely filed a Form 706, United States Estate (and Generation Skipping Transfer) Tax Return, reporting the fair market values (as of the valuation date) of Maypole as $500,000 and Orpheus as $100,000.  As noted, Mr. Wachter's September 23, 2005, letter assigning those fair market values to the paintings was attached to the return.  Respondent thereafter issued the estate a notice of deficiency determining the fair market values (as of the valuation date) of Maypole as $1,750,000 and Orpheus as $300,000.  The estate timely petitioned the Court for redetermination.  Subsequently, in an amended answer, respondent asserted that the fair market values of Maypole and Orpheus were $2,100,000 and $500,000, respectively, on the valuation date.

OPINION

I.    Valuation and the estate tax

Section 2001(a) imposes a Federal estate tax on the transfer of a decedent's taxable estate.  The taxable estate consists of the value of the gross estate after applicable deductions.  Sec. 2051.  The value of a decedent's gross estate includes the fair market value of the property owned by the decedent on the date of death.

**[*13]** Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value for this purpose is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

The estate bears the burden of proving that the values respondent determined in the statutory notice of deficiency are incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent bears the burden of proof with respect to the increased values and the increased deficiency asserted in the amended answer. Rule 142(a).

II.    Expert reports

As noted, the estate offered the expert report of George Wachter, vice chairman of Sotheby's North America and South America and cochairman of Sotheby's Old Master Paintings Worldwide,[11] and respondent offered that of Paul

_____

[11]Mr. Wachter has been a member of Sotheby's Old Master Paintings department since 1973. He became a director of the Fine Arts Division of Sotheby's in 1982 and then managing director in 1995. In 2000 Mr. Wachter was appointed vice chairman of Sotheby's North America and South America and cochairman of Sotheby's Old Master Paintings Worldwide, a position he held at the time of trial.

[*14] Cardile, Ph.D., an art historian with more than 25 years of experience as a

fine art appraiser,[12] to support their respective positions on valuation.[13]

_____

[12]Mr. Cardile holds a Ph.D. from Yale University. He has taught college and graduate courses in art history at various institutions and served as museum director of the Denison Art Gallery in Granville, Ohio, from 1978 to 1984. Mr. Cardile is certified by the Appraisers Association of America and has appraised art for museums, private individuals, and corporations for the past 30 years.

[13]The estate and respondent also attempt to support their respective valuation positions by citing the insurance coverage on the paintings. The estate points to the property casualty policy providing coverage for decedent's residence and its contents, including Maypole and Orpheus specifically, at insured values of $600,000 and $80,000, respectively. Respondent cites the insurance coverage that Mr. Hyland required Lowy to demonstrate in connection with Lowy's custody of the paintings; namely, $1 million for Maypole and $500,000 for Orpheus.
    On this record we do not find the insurance values probative of fair market value. Both experts opined that insured values are often higher than fair market value. As for the policy covering the contents of decedent's residence, there is no evidence that the coverage values for the paintings were supported by appraisals. Moreover, the coverage period for the policy was December 11, 2005, to December 11, 2006. The record demonstrates that the paintings were moved from decedent's residence shortly after her death in August 2005 to Sotheby's and then were moved to Lowy on or about October 6, 2005. They were shipped from Lowy to Mr. Hyland's residence in California on December 21, 2005. There is no evidence that the paintings were ever returned to decedent's residence. Consequently, we conclude it is unlikely that Mr. Hyland scrutinized or relied upon the coverage amounts for the paintings in this policy. They are therefore not probative regarding the fair market values.
    As for the coverage amounts that Mr. Hyland required for the Lowy policy, there is no evidence that these values were based on any appraisal. While these values might suggest that Mr. Hyland believed the paintings were worth more than the fair market value estimates he had received from Mr. Wachter, we draw no inference in that regard, given both experts' view that insurance coverage values are often higher than fair market value. On balance, we likewise do not find the

(continued...)

**[\*15]** A.    <u>In general</u>

Expert witness reports may assist the Court in understanding an area requiring specialized training, knowledge, or judgment.  <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989).  However, as the trier of fact, the Court is not bound to accept an expert's opinions.  <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285; <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734 (1985).  We may be selective in deciding what part of an expert's report we will accept.  <u>Helvering v. Nat'l Grocery Co.</u>, 304 U.S. 282, 295 (1938).  The opinions of expert witnesses are weighed according to their qualifications and other relevant evidence.  <u>Anderson v. Commissioner</u>, 250 F.2d 242, 249 (5th Cir. 1957), <u>aff'g in part, remanding in part</u> T.C. Memo. 1956-178; <u>Johnson v. Commissioner</u>, 85 T.C. 469, 477 (1985).  Opinion evidence that does not appear to be based upon disclosed facts is of little or no value.  <u>Balaban & Katz Corp. v. Commissioner</u>, 30 F.2d 807, 807-808 (7th Cir. 1929), <u>aff'g</u> 6 B.T.A. 610 (1927).

The purpose of expert testimony is to assist the trier of fact to understand evidence that will determine the fact in issue.  <u>Laureys v. Commissioner</u>, 92 T.C. 101, 127-129 (1989).  An expert has a duty to the Court that exceeds his duty to his client; the expert is obligated to present data, analysis, and opinion with detached

---

[13](...continued)
coverage amounts in the Lowy policy probative of fair market value.

[*16] neutrality and without bias. Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990). In the context of valuation cases, experts lose their usefulness (and credibility) when they merely become advocates for the position argued by a party. Laureys v. Commissioner, 92 T.C. at 129; Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).

### B. The estate's expert, Mr. Wachter

#### 1. Mr. Wachter's valuations

Mr. Wachter's report opined that the fair market values of Maypole and Orpheus on the valuation date were $500,000 and $100,000, respectively--the same fair market value estimates he gave in the September 23, 2005, letter to Mr. Hyland that was attached to the estate tax return. His report states that in forming his opinions he relied on his personal examination of the paintings and his years of professional experience valuing and selling Old Master paintings. He also cited photographs of the paintings provided to him by Lowy and his August 31 and September 23, 2005, letters to Mr. Hyland as additional sources he consulted in reaching his fair market value estimates.

Mr. Wachter's report states that his $500,000 valuation of Maypole was based on multiple factors, but he made specific reference to the painting's attribution to Pieter Brueghel and its "pleasant composition and subject matter."

[*17] However, the report asserts that on the valuation date the condition and quality of Maypole were "very unclear" because the painting was covered with a dense film of dirt and grime and had an extreme yellow discoloration. The report observes that Maypole was among the dirtier paintings that Mr. Wachter had observed in his 35-year career. In sum, the report's chief assertion is that Maypole's condition on the valuation date was so poor that "there was no way to have known for certain its inherent value". These factors, taken together, the report opines, indicated a fair market value of $500,000.

Mr. Wachter argues that two factors explain the sizable gap between his valuation and Maypole's January 2009 sale price of $2,434,500: (1) a "significant improvement" in the quality and condition of the painting as a result of the Lowy cleaning and (2) a substantial increase in market demand in the intervening period, primarily driven by a "large influx of Russian buyers" seeking Old Master paintings. As support for the second point he points to Sotheby's data showing that 5 of the 10 highest sale totals for Old Masters auctions in New York City occurred between the valuation date and January 2009.

With respect to Orpheus, Mr. Wachter's report identifies three points as affecting the painting's $100,000 valuation. First, the report attributes the painting to Jan Brueghel the Younger, whose works sell for significantly less than those of

[*18] Jan Brueghel the Elder, according to the report.  Second, his report states that Orpheus "does not have a strong composition, such that some of the animal figures are barely visible and others appear disjointed from their surroundings."  Finally, the report observes that Orpheus, like Maypole, had accumulated a layer of surface dirt and grime and had a severe yellow discoloration, making it one of the dirtier paintings Mr. Wachter had examined in his career.  The report does not make any mention of Orpheus' being bowed or warped.  As in the case of Maypole, the report concludes that Orpheus' condition on the valuation date was so poor "that there was no way to have known for certain its inherent value".  These factors, taken together, the report opines, indicated a fair market value of $100,000.

In his report and testimony Mr. Wachter placed significant emphasis on the precleaning condition of the paintings, which he characterized as extremely dirty, grimy, and discolored.  He knew decedent and as noted visited her residence on several occasions starting in 1981.  He described decedent as a heavy smoker and attributed the soiled condition of the paintings on the valuation date in part to years of tobacco smoke exposure.

In addition, Mr. Wachter's report maintains that cleaning the paintings posed a very substantial risk because the process might reveal hidden flaws beneath the surface or otherwise damage them, compromising their values to such an extent

[*19] that they might have been left unmarketable. His report states that, because of this risk, Sotheby's general practice is to avoid cleaning Old Master paintings before selling them. His report further states that he generally does not advise clients to clean Old Master paintings before placing them for sale. The implicit premise in Mr. Wachter's fair market value estimates was that a willing buyer would demand, and a willing seller would have to accept, a substantial discount off the value each painting would have after a successful cleaning, to take into account the risk of adverse effects from the cleaning process.

## 2. Rejection of Mr. Wachter's valuations

We find Mr. Wachter's valuations unreliable and unpersuasive for several reasons. First, he had a significant conflict of interest that could cause a reasonable person to question his objectivity. Mr. Wachter first gave his fair market value estimates for the paintings at the time of decedent's death (in amounts that remained unchanged in his expert report prepared for trial). His correspondence with Mr. Hyland during that period demonstrates that the two had previously discussed the disposition of Maypole and Orpheus upon decedent's death and that Mr. Hyland was considering selling the paintings. Mr. Wachter provided his fair market value estimates at the same time he was soliciting Mr. Hyland for the exclusive rights for five years to auction the paintings in the event they were

[*20] sold.[14] Under Sotheby's terms at that time, an auction sale would have entitled Sotheby's to a 20% commission on the first $200,000 of the hammer price and 12% of the remainder.[15] Thus, Mr. Wachter, on behalf of his firm, had a direct financial incentive to curry favor with Mr. Hyland by providing fair market value estimates that benefited his interests as the estate's residual beneficiary--that is to say, "lowball" estimates that would lessen the Federal estate tax burden borne by the estate. The fair market value estimate letter Mr. Wachter provided to Mr. Hyland was in fact used by him as the basis for the values reported on the estate tax return. The fact that Mr. Wachter simultaneously presented Mr. Hyland with these fair market value estimates and his pitch for exclusive auction rights for Sotheby's gives rise to an inference that the latter affected the former.

Second, on the basis of other substantial evidence in the record, we are convinced that Mr. Wachter exaggerated the dirtiness of the paintings on the valuation date and the risks involved in cleaning them. If cleaning the paintings presented the magnitude of risk postulated by Mr. Wachter, we find it

---

[14]As noted in our findings, Mr. Hyland in fact entered into the proposed exclusivity agreement with Sotheby's, and Maypole was successfully auctioned by Sotheby's in January 2009.

[15]Even under Mr. Wachter's fair market value estimates for the paintings, Sotheby's stood to gain $76,000 and $20,000 on any auction sale of Maypole and Orpheus, respectively.

[*21] inconceivable that he would not have raised these concerns with Mr. Hyland in the course of their discussions concerning auctioning the paintings. Yet Mr. Wachter did not recall any such discussion.[16] Instead, Mr. Hyland made the decision to have the paintings cleaned because personnel at Lowy--a leading fine arts conservator--recommended cleaning and did not believe it posed any significant risk.

Bill Santel, chief conservator at Lowy who performed the initial examination of the paintings, testified that when he first examined Maypole it was dirty, appeared to have been cleaned previously but not recently, and was "a pretty good painting to be cleaned". He testified that if he had owned it he would have cleaned it, as doing so seemed "reasonably safe". Mr. Santel similarly stated that Orpheus was dirty but not the dirtiest painting he had ever seen. Even Mr. Shar--the estate's own witness--contradicted Mr. Wachter's assertions about the risk of cleaning the paintings, testifying that although both paintings were quite dirty and discolored, it appeared the dirt and grime could be removed easily, and he therefore recommended to Mr. Hyland that he have the paintings cleaned. The condition report for each painting, prepared after a window test, recorded that the dirt on

_____

[16]Mr. Hyland was present at trial but did not testify.

**[*22]** each was "surface" rather than "embedded", an important distinction according to Mr. Santel, because the former is generally much easier to clean.

The cleaning process itself corroborated the Lowy witnesses' precleaning assessments. Mr. Santel and Mr. Shar both explained that only the mildest detergents used for cleaning paintings, Wolbers and naphtha, were required to clean Maypole and Orpheus. Mr. Shar testified that this was unusual and that typically stronger detergents are required. The success of these mild detergents, according to Mr. Santel, confirmed that the paintings were covered in surface dirt only; he testified that if the dirt had been heavily embedded in the varnish or the paint, the mild detergents "could not possibly have achieved the results that they did." Mr. Santel further testified that the duration of the cleaning processes, recorded in the Lowy treatment reports as three hours for Maypole and two hours for Orpheus, indicated that these cleanings were comparatively easy and problem free. There is no dispute that the paintings' cleanings were unqualified successes.[17] On balance, the Lowy condition and treatment reports and the testimony of the Lowy personnel who also examined the paintings in their precleaning condition convince us that Mr. Wachter exaggerated both the dirtiness of the paintings and the risks inherent in cleaning them.

---

[17]Mr. Wachter characterized Maypole's postcleaning appearance as "fabulous" and a "winner".

**[\*23]** Third, Mr. Wachter's analysis and conclusions regarding the risks of cleaning the paintings are contrary to the well-established principle that the hypothetical willing buyer and seller are presumed to have "reasonable knowledge of relevant facts" affecting the value of property at issue. Sec. 20.2031-1(b), Estate Tax Regs. This presumption applies even if the relevant facts at issue were unknown to the actual owner of the property. United States v. Simmons, 346 F.2d 213, 217-218 (5th Cir. 1965). Moreover, both parties are presumed to have made a reasonable investigation of the relevant facts. Id. Thus, in addition to facts that are publicly available, reasonable knowledge includes those facts that a reasonable buyer or seller would uncover during the course of negotiations over the purchase price of the property. See Bergquist v. Commissioner, 131 T.C. 8, 19 (2008) (concluding that on the valuation date a corporation was no longer a going concern as "a reasonably informed and willing buyer or seller" would have been aware of imminent changes likely to cause operations to cease).

We believe that given the dirty condition of the paintings on the valuation date, a reasonable investigation into their values would involve at the very least seeking an opinion from a conservator about the risks and likely outcome of having them cleaned. See Simmons, 346 F.2d at 217-218 (finding that a "sufficient examination" of decedent's records in existence on the date of death would have

**[\*24]** revealed certain evidence establishing the value of a tax refund claim because such evidence "was always there to be found").

Moreover, a hypothetical willing buyer is presumed to be "reasonably informed" and "prudent" and to have asked the hypothetical willing seller for information that is not publicly available. See Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148 (determining that the use of financial data not publicly available on the valuation date to value a company was appropriate because a willing buyer could have inquired and elicited the nonpublic information from the company); Dise v. Commissioner, T.C. Memo. 1986-87 (holding that a discount should apply to the value of commercial real estate where the parcel suffered from a water shortage problem that was not generally known but was "readily discoverable" to "a reasonably informed buyer"); Estate of Tully v. United States, 41 A.F.T.R.2d (RIA) 78-1477 (Ct. Cl. 1978) (finding that the value of corporation stock on the valuation date should reflect that company officials were engaged in illegal activities that were not revealed to the public until four years later but nonetheless were evidenced by "red flags" that "would have been obvious to a prudent purchaser and prompted further inquiry").

Two witnesses from the same leading conservator--one called by the estate, the other by respondent--who each examined the paintings in their condition near

**[\*25]** the valuation date and before cleaning, both judged cleaning to be a well-advised and low-risk undertaking. This information was readily discoverable.[18] The hypothetical willing buyer and seller are chargeable with knowledge of it. We conclude that the effective discount urged by Mr. Wachter, on the premise that the risks posed by cleaning were substantial, is contrary to the presumption of section 20.2031-1(b), Estate Tax Regs., that the willing buyer and seller have reasonable knowledge of relevant facts.

Fourth, even if we accepted Mr. Wachter's contentions regarding the risks of cleaning the paintings (which we do not), he has provided no comparables to support his valuations.[19] This omission is remarkable. We have repeatedly found sale prices for comparable works quite important to determining the value of art.

---

[18]We emphasize in this regard that both witnesses from Lowy judged cleaning to be advisable on the basis of their initial inspections of the paintings <u>before</u> any window tests were performed. We do not believe that the results of window tests would constitute reasonable knowledge of relevant facts because the window tests were invasive and the hypothetical willing seller would not necessarily have agreed to them.

[19]At trial the estate also proffered an expert report by Clarissa Post, Sotheby's vice president of Old Master paintings. Ms. Post's report used comparables. She was not available to testify and be cross-examined, however, and respondent accordingly objected to the admission of the report. The estate thereupon withdrew it. The report was in any event inadmissible in view of the author's being unavailable for cross-examination. See <u>Van der Aa Invs., Inc. v. Commissioner</u>, 125 T.C. 1, 6-7 (2005); <u>Pack v. Commissioner</u>, T.C. Memo. 1980-65.

[*26] See, e.g., Estate of Smith v. Commissioner, 57 T.C. 650, 659 (1972), aff'd on another issue, 510 F.2d 479 (2d Cir. 1975); Mathias v. Commissioner, 50 T.C. 994 (1968); Estate of Mitchell v. Commissioner, T.C. Memo. 2011-94, 101 T.C.M. (CCH) 1435, 1442-1444 (2011); Doherty v. Commissioner, T.C. Memo. 1992-98, 63 T.C.M. (CCH) 2112, 2115 (1992), aff'd, 16 F.3d 338 (9th Cir. 1994); Farber v. Commissioner, T.C. Memo. 1974-155, 33 T.C.M. (CCH) 673, 675 (1974), aff'd without published opinion, 535 F.2d 1241 (2d Cir. 1975).  In the absence of comparables, Mr. Wachter's report lacks any objective support for his valuation figures; he effectively urges the Court to accept them on the basis of his experience and expertise.  We have no basis for doing so.  See Frates v. Commissioner, T.C. Memo. 1987-79, 53 T.C.M. (CCH) 96, 99 (1987) (rejecting expert's art valuations for lack of evidence of comparable sales); Reynolds v. Commissioner, T.C. Memo. 1981-714, 43 T.C.M. (CCH) 115, 116 (1981) ("Petitioners' expert has the more impressive credentials but essentially asks the Court to accept his conclusions without offering an adequate explanation as to how these conclusions can be reached."); Stone v. United States, 99 A.F.T.R.2d (RIA) 2007-2992 (N.D. Cal. 2007) (rejecting a Sotheby's appraisal lacking a description of how the valuations were reached), supplemented by 100 A.F.T.R.2d (RIA) 2007-5512 (N.D. Cal.

**[*27]** 2007), aff'd, Stone ex rel. Stone Tr. Agreement v. United States, 103 A.F.T.R.2d (RIA) 2009-1379 (9th Cir. 2009).

Finally, there is the issue of Maypole's sale in January 2009. In general, a valuation of property for Federal tax purposes is made as of the valuation date without regard to any event happening after that date. See Ithaca Tr. Co. v. United States, 279 U.S. 151 (1929). Post-valuation-date events, however, are not necessarily irrelevant to a determination of fair market value as of the valuation date. The general rule against consideration of post-valuation date events is a rule of relevance. See First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985); Estate of Jung v. Commissioner, 101 T.C. 412, 431-432 (1993). Thus in some cases the subsequent sale price of a painting can be probative evidence of its fair market value on the valuation date, assuming intervening market conditions are taken into account. See Estate of Newberger v. Commissioner, T.C. Memo. 2015-246, at *6.

Mr. Wachter attempts to account for the nearly fivefold increase in value between his $500,000 valuation in September 2005 and Maypole's $2,434,500 sale price in January 2009 by arguing that (1) the Lowy cleaning vastly improved the painting's condition and (2) there was a significant surge in the market demand for Old Master paintings after 2005.

[*28] We have rejected Mr. Wachter's claims regarding Maypole's precleaning condition as exaggerated. As for his claims regarding market demand, the estate introduced aggregate auction sales results demonstrating that 5 of the 10 highest sale totals for Old Masters auctions at Sotheby's and Christie's occurred after 2005 and included the January 2009 Sotheby's Old Masters auction. However, because these are only gross sales figures, they do not demonstrate the extent of appreciation in individual paintings, as the sales figures may reflect a larger volume of paintings sold rather than an increase in sale prices. Consequently, the aggregate sales volume figures fall considerably short of persuading us that either Brueghel paintings, or Old Master paintings generally, experienced a nearly fivefold increase in value between August 2005 and January 2009. Yet an appreciation rate of this magnitude would be necessary to reconcile Mr. Wachter's $500,000 valuation of Maypole with its sale at auction less than 3-1/2 years later for approximately $2,400,000. For this reason, we find that the January 2009 auction price casts doubt on Mr. Wachter's valuation. The lack of post-2005 market data in the record precludes any more definitive finding from Maypole's January 2009 sale price.

**[*29]** For the foregoing reasons, we give very little weight to Mr. Wachter's report and testimony regarding the fair market values of the Brueghel paintings on the valuation date.

### C. Respondent's expert Mr. Cardile

#### 1. Respondent's burden of proof

We turn to a consideration of whether respondent has met his burden of showing that the paintings' fair market values were equal to the amounts asserted in his amended answer; namely, $2,100,000 for Maypole and $500,000 for Orpheus.

#### 2. Mr. Cardile's valuations

As noted, respondent offered the expert report and testimony of Paul Cardile. Mr. Cardile assigned valuation date fair market values of $2,100,000 to Maypole and $500,000 to Orpheus. He attributed Orpheus to Jan Brueghel the Elder but acknowledged a dispute over its attribution and therefore provided an alternate valuation of $325,000 in the event the painting were attributed to Jan Brueghel the Younger (as contended by Mr. Wachter). Mr. Cardile employed a comparative market data approach as his valuation method.

**[\*30]**                    a.        <u>Maypole</u>

Mr. Cardile's report observes that Maypole's image is one of Pieter Brueghel's more popular motifs and is discussed in all the major works written about him. The report explains that the popularity of kermesse (i.e., festival) scenes such as Maypole caused Pieter Brueghel to produce multiple versions through his workshop, with differing degrees of involvement by Brueghel himself as opposed to workshop craftsmen. According to the report, the successful works would receive Pieter Brueghel's signature and sometimes the date.

Mr. Cardile's report contends that the quality and valuation of Pieter Brueghel's works largely turn on three factors: (1) the degree to which Pieter Brueghel's "hand"--that is, his direct intervention, correction, and supervision--is apparent in the work; (2) the condition of the work; and (3) the size of the work. The report notes that provenance (i.e., record of ownership) and citation in the literature are additional factors that may add to the value indicated by the first three.

The report identifies as comparables, and provides the public auction sale prices for, four Pieter Brueghel paintings featuring the same subject and composition as Maypole (Maypole-scene paintings) that were sold at auction from 1986 through 1999, as follows:

[*31]

| Date of sale | Description (inches) | Price |
|---|---|---|
| Apr. 9, 1986 | Peasants Dancing Around a Maypole (20 by 29.5) | $538,560 |
| Dec. 3, 1997 | Village Scene With Peasants Dancing Around a Maypole (19.5 by 33.7) | 3,330,252 |
| Jan. 28, 1999 | Village Kermesse With Dance Around the Maypole (21.75 by 30.5) | 1,047,500 |
| Dec. 4, 1999 | Der Tanz um den Maibaum [Dance Around the Maypole] (19.3 by 30.1) | 1,160,811 |

According to the report, no other versions of the Maypole scene sold from 1999 through the valuation date. However, the report identifies three other paintings by Pieter Brueghel featuring a village kermesse but not a Maypole scene --which, according to the report, were "well within the parameters" of comparables--that did sell at public auction during this period, as follows:

| Date of sale | Description (inches) | Price |
|---|---|---|
| July 12, 2001 | A Village Kermesse (39 by 65.7) | $5,419,831 |
| Dec. 8, 2004 | Kermesse of St. George (46 by 69.1) | 7,159,767 |
| July 7, 2005 | Kermesse of St. George (28.4 by 40.6) | 3,957,746 |

**[*32]** Mr. Cardile's report treats these latter three paintings as a "secondary" group of comparables, cited for the purpose of demonstrating that the market for Pieter Brueghel village scenes remained strong after the international economic downturn that followed the September 11, 2001, terrorist attacks in the United States and continued to strengthen through the first half of 2005.

With respect to the comparables, Mr. Cardile's report opines that Maypole was closest in quality and condition to the Maypole-scene painting that sold for $3,330,272 in 1997. That Maypole-scene painting, according to Mr. Cardile, was considered by some to be the prototype for the others. Maypole (i.e., the painting at issue) exhibited the quality of the 1997-auctioned Maypole-scene painting because, Mr. Cardile opined, the facial characteristics in both were more lifelike, reflecting work by Pieter Brueghel himself rather than workshop craftsmen. Mr. Cardile found the Maypole-scene painting that sold for $538,560 in 1986 to be a poor comparable because it had been transferred from its original support and was therefore in a compromised condition. Likewise, he thought the two Maypole-scene paintings that each sold for approximately $1 million in 1999 to be inferior artistically in that the facial features of the villagers were more caricaturelike, demonstrating a greater amount of workshop intervention than with Maypole.

**[*33]** The estate through its expert Mr. Wachter offered no specific rebuttal to Mr. Cardile's thesis that Maypole was most comparable to the 1997-auctioned Maypole-scene painting because both exhibited superior artistic quality in the rendering of facial features (reflecting the hand of Pieter Brueghel himself). Mr. Wachter conceded that Mr. Cardile's comparables were "good" ones but insisted that the most comparable of the Maypole-scene paintings was one of the 1999-auctioned works--specifically the one auctioned at Sotheby's for $1,047,500 --because that painting, like Maypole on the valuation date, was quite dirty.

The Maypole-scene painting he argues is most comparable to Maypole sold for over $1 million on January 28, 1999, in a dirty, uncleaned condition (as contended by Mr. Wachter and as reflected in the photograph thereof in evidence). Both that work and Maypole are of the same scene and are the same approximate size. Yet Mr. Wachter's position is that Maypole's value more than six years later on the valuation date was only $500,000--not quite half the sale price of the work he deems most comparable.[20] Mr. Wachter sought to reconcile this discrepancy by

---

[20]Mr. Wachter also offered no rebuttal to Mr. Cardile's contention that the market for Pieter Brueghel paintings remained strong from 1999 through 2005--notwithstanding the international economic downturn occasioned by the September 11, 2001, terrorist attacks in the United States--as supported by his auction sale data from 2001, 2004, and 2005.

[*34] contending that Maypole was so much dirtier than the 1999-auctioned Maypole-scene painting that the risk of cleaning it was considerably greater.

Mr. Wachter is, again, unpersuasive. As before, we reject his "cleaning risk" thesis as exaggerated as to any value diminution. Mr. Cardile's reasons for finding the 1997-auctioned Maypole-scene painting most comparable to Maypole have not been rebutted by the estate, and we accept his opinion on this point.

Having established the comparability of the 1997-auctioned Maypole-scene painting, Mr. Cardile's report nonetheless contends that a downward adjustment in Maypole's value was appropriate to account for the fact that the 1997-auctioned work's provenance was superior to Maypole's--the former, according to Mr. Cardile's findings, having come from the collection of a well-known collector whereas Maypole was likely from the F. B. Greenstreet Collection in London and then was in a lesser-known American private collection (i.e., decedent's) from approximately 1940.

Finally, Mr. Cardile's report considered the village-kermesse-scene comparables that were auctioned in 2001, 2004, and 2005 for prices ranging from approximately $4 to $7 million, taking into account the larger size of each and the different subject matter. Relying principally on the 1997-auctioned work, and Maypole's similar superior artistic quality and condition, yet lesser provenance,

[*35] Mr. Cardile concluded that Maypole's fair market value on August 31, 2005, was $2,100,000.

We accept that valuation with one qualification. On the basis of the entire record, we are satisfied that on the valuation date Maypole was quite dirty and needed to be cleaned by a conservator. We further accept that cleaning such a painting presented some degree of risk of damage for which a hypothetical willing buyer would insist on a discount. We are not persuaded of Mr. Wachter's description of the nature or degree of that risk, as it is incompatible with the routine manner in which Mr. Hyland, in consultation with a preeminent conservator, made the decision to clean the painting. Mr. Cardile made no adjustment for the dirty condition of Maypole on the valuation date, observing that "surface dirt do[es] not affect the intrinsic value of an Old Master Painting." In view of the conservators' assessment of the low risk of cleaning, we place the discount at 5%. Respondent has therefore shown, and we hold, that the fair market value of Maypole on the valuation date was 95% of Mr. Cardile's $2,100,000 valuation, or $1,995,000.

#### b.   Orpheus

As noted, Mr. Cardile's report attributed Orpheus to Jan Brueghel the Elder in contrast to Mr. Wachter's position that it should be attributed to Jan Brueghel

**[*36]** the Younger. Mr. Cardile's report offered several reasons for this position. First, the report notes the catalog from a 1940 exhibition of Orpheus at West's Gallery in London made this same attribution. Second, the report opines that although Orpheus appears to be a unique composition, the style in which the animals are painted shows the hand of Jan Brueghel the Elder as reflected in the rendering of animals in his known works. Third, the report cites the writings of Klaus Ertz--acknowledged by both expert witnesses as a key authority on the Brueghels--for the proposition that mythological themes played "a rather subordinate role" in Jan Brueghel the Younger's work.

Mr. Cardile's report found that no works of the same subject and composition as Orpheus, either by Jan Brueghel the Elder or Jan Brueghel the Younger, were sold at public auction between 1986 and August 2005. However, the report posits that three nonetheless comparable works by Jan Brueghel the Elder were sold at auction from 2001 to 2004, as follows:

**[\*37]**

| Date | Description (inches) | Price |
|------|----------------------|-------|
| June 24, 2004 | St. Margaret and the Dragon (10.4 by 14) | $422,050 |
| Dec. 10, 2003 | Virgin and Child With Saints Surrounded by Garlands in a Landscape (36.9 by 28.5) | 2,159,249 |
| Jan. 26, 2001 | Allegory of the Five Senses (24.2 by 39.4) | 666,000 |

The report posits that if Orpheus is attributed to Jan Brueghel the Elder, it compares favorably to his other works and displays the best of his style. It opines that Orpheus is more valuable than the 2004-auctioned work, because the latter is smaller, but is less valuable than the 2001-auctioned work, because the latter is larger and more complex.[21] The report accordingly estimates the fair market value of Orpheus if attributed to Jan Brueghel the Elder at $500,000.

In view of the dispute over attribution, Mr. Cardile's report also posited comparables if Orpheus were attributed to Jan Brueghel the Younger. Those comparables were sold at public auction from 2001 through 2005, as follows:

---

[21]Mr. Cardile does not address the comparability of the 2003-auctioned work. The sale of this work would tend to suggest a higher value for Orpheus in any event.

**[*38]**

| Date | Description (inches) | Price |
|------|----------------------|-------|
| July 6, 2005 | Garden of Eden (23 by 35.2) | $364,788 |
| Apr. 18, 2002 | Element of Air (21.5 by 37) | 348,822 |
| July 10, 2002 | Sense of Hearing (22.5 by 34.6") | 333,359 |
| July 11, 2001 | Allegory of the Four Elements (25.8 by 37.4) | 469,541 |

The report concludes that a "conservative" estimate of Orpheus' value if attributed to Jan Bruegel the Younger would be $325,000, a figure less than any of the cited comparables' sale prices.

Finally, Mr. Cardile's report notes with respect to Orpheus' condition that "no bowing of the surface is apparent from the submitted photographic images" and that "surface dirt do[es] not affect the intrinsic value of an Old Master Painting."

We generally accept Mr. Cardile's fair market value estimates for Orpheus. He presented cogent explanations for concluding that the painting is properly attributed to Jan Brueghel the Elder whereas Mr. Wachter offered only the conclusory observation that he was unaware of any leading scholar who would

[*39] contend for the attribution to Jan Brueghel the Elder.  As with Maypole, Mr. Cardile supported his valuations of Orpheus with reasoned argument based on objective market data.

However, we find that certain adjustments are necessary.  First, as with Maypole, Mr. Cardile made no adjustment for the dirty condition of Orpheus on the valuation date.  The evidence satisfies us that Orpheus was quite dirty on the valuation date and therefore in need of a routine cleaning by a conservator.  We thus, as with Maypole, apply a 5% discount to account for the risk of cleaning.

Second, Mr. Cardile's report makes clear that he did not believe Orpheus was bowed.  The Lowy condition report establishes to our satisfaction that Orpheus was bowed on the valuation date.  Mr. Cardile conceded at trial that bowing, depending on its extent, would "possibly" have a negative impact on Orpheus' value.  The record provides us scant evidence upon which to calculate the discount a willing buyer would insist upon for bowing, though our best judgment is that some discount would be necessary in relation to an identical painting that was not bowed.  We find guidance nonetheless in the fact that the estate's expert, Mr. Wachter, whose valuation was based upon a firsthand inspection of Orpheus, made no mention of the bowing in his report.  We therefore will apply a 10% discount off Mr. Cardile's valuation to account for the bowing.

[*40] Finally, while we found Mr. Cardile's report largely persuasive regarding Orpheus' attribution to Jan Brueghel the Elder, an attribution dispute nevertheless exists, rendering a discount appropriate. See Mathias v. Commissioner, 50 T.C. 994, 998 (1968); Doherty v. Commissioner, T.C. Memo. 1992-98, 63 T.C.M. (CCH) 2112, 2114-2115 (1992), aff'd, 16 F.3d 338 (9th Cir. 1994). Mr. Cardile valued Orpheus at $500,000 if attributed to Jan Brueghel the Elder and $325,000 if attributed to Jan Brueghel the Younger, an effective 35% discount for attribution to the lesser-regarded artist. Because Mr. Cardile has made a stronger case for attribution to Jan Brueghel the Elder, we weight the discount towards that attribution and limit it to 10%. Thus, applying a total discount of 25% off Mr. Cardile's $500,000 valuation premised on a Jan Brueghel the Elder attribution, respondent has met his burden of showing, and we hold, that Orpheus had a fair market value of $375,000 on the valuation date.

To reflect the foregoing,

Decision will be entered

under Rule 155.